Peter CHOHARIS, Appellant,

v.

STATE FARM FIRE AND CASUALTY
COMPANY, Appellee.

No. 06–CV–234.

District of Columbia Court of Appeals.

Argued Nov. 15, 2007.

Decided Dec. 18, 2008.

Peter C. Choharis, pro se, with whom Paul Y. Kiyonaga was on the brief, Washington, for appellant.

Michael J. Budow, Bethesda, MD, with whom Richard E. Schimel and Laura Basem Jacobs were on the brief, for appellee.

Before REID, Associate Judge, and FERREN and STEADMAN, Senior Judges.

STEADMAN, Senior Judge:

In the spring of 2001, the home of appellant Peter Choharis ("Choharis") sustained significant water damage from a malfunctioning upstairs radiator. Choharis filed several claims under his homeowner's policy with appellee State Farm Fire and Casualty Company ("State Farm"). A series

of disputes arose over the handling of the claims, which eventually resulted in the present litigation. Choharis presents three major issues for resolution in this appeal: first, whether this jurisdiction will recognize a tort of bad faith in the handling of insurance claims and, as a related issue, whether summary judgment was proper on his alleged torts of fraud and negligent misrepresentation; second, whether he may recover punitive damages on his contract cause of action; and third, whether he should have had the right to amend his complaint. The trial court ruled in State Farm's favor on all these issues. We affirm.

## I. Background

### A. Facts[1]

In the spring of 2000, Choharis purchased a three-bedroom house in the Woodley Park neighborhood of Washington, D.C. At the same time, Choharis purchased homeowner's insurance coverage with appellee State Farm. The policy covered losses from "[s]udden and accidental discharge or overflow of water ... from within ... plumbing, heating, [or] air conditioning." The policy did not cover losses "caused by or resulting from continuous or repeated seepage or leakage of water ... which occurs over a period of time and results in deterioration ... mold, [etc]."

The policy also provided that "[w]hen a Loss Insured causes the residence premises to become uninhabitable, [the policy covers] the necessary increase in cost [an insured incurs] to maintain [the insured's] standard of living for up to 24 months ... [P]ayment is limited to incurred costs for the shortest of: a) the time required to repair or replace the premises, b) the time required for your household to settle elsewhere, or c) 24 months. When a Loss Insured causes that part of the residence premises rented to others or held for rental by you to become uninhabitable, we will cover its fair rental value."

On April 17, 2001, Choharis returned home to find hundreds of gallons of water gushing from an upstairs radiator that flooded the top two floors and basement apartment of his house. Choharis sought recovery under the policy for several elements of damage, including the cost of repairs, temporary housing costs, lost rental income, and personal property losses. Extensive and increasingly heated disputes arose between Choharis and State Farm over a period of many months on a number of issues relating to these claims.[2] While objecting to a number of aspects of State Farm's handling of his claims, Choharis focuses in particular on State Farm's treatment of his housing and living expenses and of a mold condition relating to the flooding.[3]

---

1. Choharis's complaint contains an extremely detailed recitation of his adverse experience with State Farm extending over fifty-eight pages. We present here what we understand to be Choharis's major assertions underlying his action against State Farm. We present those facts in the light most favorable to Choharis, since he was the party against whom the dismissals and summary judgment were entered.

2. In his complaint, Choharis indicates that he eventually received checks from Sate Farm on his claims totaling some $112,000. The in-

stant litigation settled for an additional $50,000.

3. State Farm refused to pay for "lost rent" from the basement apartment on grounds that it was not rented at the time of loss. Choharis contends that he had rented his basement to a tenant for two months, but that the tenant had to move out because he left his job. Although this tenant never paid rent, Choharis maintains that "it was [his] intention to receive money [for rent]." With respect to his personal property losses, Choharis asserts that State Farm refused to make any

*Housing*

Choharis asserts that under the policy, State Farm should have promptly provided him with at least a three-bedroom house while his home was uninhabitable and that such housing was readily available in the neighborhood. On April 19, 2001, Choharis asked State Farm Claim Representative Damian Ruesink how soon he could move into short-term housing and Ruesink informed him that short-term housing was difficult to find and that State Farm did not want to pay for a lease that exceeded the repair time. Choharis maintains that Ruesink made this false representation knowing that State Farm had employed the CRS Temporary Housing agency to find short-term housing in Washington, D.C. for other clients in the past. Relying on Ruesink's representation that short-term housing was difficult to obtain, Choharis moved into a room at the Omni Shoreham hotel for almost a year, incurring considerable expenses. It was not until December 13, 2001, eight months later, that Ruesink informed Choharis that State Farm was trying to secure short-term housing for him through its agency. Short-term housing was eventually finalized in March 2002, after almost one year in a hotel, when Choharis located a one-bedroom apartment through his own efforts. Choharis argues that this delay was deliberate as evidenced by the fact that a representative from CRS Temporary Housing complained to him on February 25, 2002, that State Farm was not willing to work with them because State Farm was asking CRS Temporary Housing to search for properties that were far less expensive than those actually available in the market.

*Reimbursement of Living Expenses*

On June 18, 2001, Ruesink wrote to Choharis asking him to submit a "schedule of payments on that account because Choharis normal, pre-loss expenses" including "a dollar amount for meals eaten outside of the residence premises, phone and utility expenditures, and other related housing expenses" in order to process his additional living expenses. On November 15, 2001, Ruesink informed Choharis that a review of his receipts was ongoing and that the information he submitted was insufficient to accurately calculate his Additional Living Expense ("ALE") reimbursement. Ruesink asked Choharis to complete an ALE form at his "earliest possible convenience" because it was "necessary to calculate any reimbursement." On November 20, 2001, Choharis submitted an ALE worksheet with the necessary information for reimbursement. Choharis maintains that this was the first time that he was made aware of such a form. Choharis argues that State Farm gave a series of pretexts over the course of a year for withholding payments owed to him. State Farm objected to his valet laundry costs as "neither reasonable nor necessary" and refused to pay for his laundry and long distance calls because they were not a part of his living expenses before the loss. Choharis argues State Farm never indicated that it would not permit these kinds of expenses which Choharis contends were entirely foreseeable.

*Mold*

On June 21, 2001, Choharis in a letter alerted State Farm that mold was growing in his home. On that day, Rick Scotton, Ruesink's supervisor, wrote in a State Farm activity log that "[m]old is a consideration [in Mr. Choharis' home] if the plywood got wet and circulation is limited as to not allow the water to dry." Although State Farm knew that mold was a health hazard, it did not notify Choharis of this fact and did nothing for a number of filed the instant law suit.

months. On November 27, 2001, Choharis requested environmental testing for mold and mildew. The next day, denying that it had been aware of a mold problem, State Farm informed Choharis that the claims office would need to inspect the house before agreeing to incur any expense related to an environmental hygienist. On February 1, 2002, Ruesink informed Choharis that after an examination of the property, Ruesink found that there was a "substantial lack of surface mold," thus making it "unnecessary to contract with an allergist to examine the property." Ruesink also indicated that hiring an allergist was unnecessary since the area in question was "already slated for demolition and removal."

When Choharis threatened litigation, State Farm ultimately agreed to have Choharis's home tested; however, it informed Choharis that the testing would be "subject to a Reservation of Rights because there is a question as to whether [State Farm] is obligated under the policy for loss due to mold." During this time, Choharis asserts that he made repeated visits to the house, exposing himself to dangerous mold toxins. State Farm hired Marshall, Miller & Associates ("MM & A") to perform mold remediation on Choharis's property. On July 29, 2002, MM & A conducted a clearance inspection to verify that fungal remediation had been conducted by AllPro, a general contractor.[4] On August 19, 2002, MM & A wrote to Ruesink stating that "[t]he results of the air sampling combined with the observations noted during the clearance inspection indicated that the mold problem related to the subject claim had been effectively remediated [by AllPro]; therefore, the structure

was acceptable for occupancy on the date of the clearance inspection."

In addition to the delays and repeated challenges to his various claims, Choharis insists that further evidence of State Farm's willful delay is the fact that it referred Choharis's claim to its Special Investigations Unit ("SIU") which conducts in-depth investigations of insureds involving financial background checks and private investigators. Choharis argues that although it is State Farm's policy to inform insureds of such referrals, he was never told. A State Farm representative conceded during a deposition that the facts underlying Choharis's claim did not warrant an SIU referral.

In summary, Choharis asserts that State Farm committed fraudulent or negligent misrepresentations and/or bad faith acts on ten separate matters for more than a year: (1) housing, (2) laundry, (3) long distance telephone charges, (4) hotel parking, (5) seven-month or greater delay in paying living expenses, (6) repairs to home, (7) mold, (8) asbestos, (9) personal property, and (10) rental income.

### B. Litigation

On April 16, 2004, Choharis filed a seven-count complaint against State Farm for (1) breach of contract, (2) fraud, (3) bad faith, (4) conversion, (5) negligent misrepresentation, (6) assumpsit, and (7) replevin. For the breach of contract claim, Choharis alleged that State Farm denied him full payment for his living expenses, delayed payments for a number of months for repairs to his home, including mold testing and remediation, refused to pay for lost rental income, denied him temporary housing at the same standard of living offered by his house, and failed to reimburse him

---

4. AllPro removed fungal growth and vacuumed wood materials in the residence. It also applied a white sealant to exposed surfaces and removed plaster from various parts of the home.

for his lost personal property. He sought to recover damages under the policy "in an amount to be determined according to proof at the time of the trial." For the fraud, negligent misrepresentation, and bad faith claims, Choharis alleged that State Farm falsely claimed that they had a policy of not entering into short-term leases for housing and forced him to live in a hotel. Choharis also alleged that State Farm later falsely claimed that no appropriate, short-term housing was available and misrepresented that his home did not require mold remediation. Choharis asserted that State Farm referred his claim to the SIU in a deliberate attempt to delay payment. For these torts, Choharis sought to recover "damages under the Policy, plus interest, and other economic and consequential damages, in an amount to be shown at the time of trial." For the conversion and replevin claim, Choharis alleged that State Farm converted his payments and monies by refusing to make payments owed to him.

On August 9, 2004, the trial court dismissed, as a matter of law under Super. Ct. Civ. R. 12(b)(6), the claims for (1) bad faith, (2) conversion, and (3) replevin ("Motion to Dismiss Order"). It found no support in the law of the District of Columbia for a tort of bad faith in an insurance company's failure to pay a claim, and ruled that neither conversion nor replevin applied to an obligation to pay money where no funds were earmarked for that purpose. On April 29, 2005, Choharis filed a Motion to Amend Complaint and for Reconsideration of the Dismissed Bad Faith and Conversion Claims ("Motion to Amend"). The Motion to Amend included the original claims and added new claims for breach of the covenant of good faith and fair dealing (contract claim), breach of fiduciary duty, and claims for five specific forms of bad faith.[5] That same day, State Farm filed a Motion for Partial Summary Judgment on the tort claims of fraud and negligent misrepresentation and to bar any award of punitive damages.

On December 14, 2005, the trial court granted State Farm's Motion for Partial Summary Judgment. The trial court made three rulings. First, it held that "[t]his Court will not recognize a tort action in a first-party breach of contract situation by allowing plaintiff's claims for negligent misrepresentation and fraud to proceed" because to do so would create a hybrid tort/contract claim which raises numerous policy concerns. Second, the trial court held that the District of Columbia does not allow punitive damages for breach of contract claims when summary judgment eliminates all tort claims and where the conduct does "not [assume] the character of a willful tort." The court chose to reserve judgment on attorneys' fees until the conclusion of the case. Finally, the trial court denied Choharis's Motion to Amend as belated and not containing any new counts not subject to dismissal as improper torts.

On December 29, 2005, State Farm mailed an Offer of Judgment to Choharis for $50,000 stating that each party would "cover their own costs through the date of [the] offer." On January 17, 2006, Choharis filed a Notice of Acceptance ("Notice") with the Superior Court. This Notice provides that "Final Judgment may now be entered in this case against Defendant on [the breach of contract and assumpsit claims], and against Plaintiff on [the fraud, bad faith, conversion, negligent misrepresentation, and replevin claims]."

---

**5.** The five forms of bad faith were (1) vexatious refusal to pay, (2) vexatious refusal to pay in a timely manner, (3) failure to conduct good faith investigation of insured's claims, (4) failure to disclaim coverage in a timely manner, and (5) continuing bad faith.

It also states that "[p]laintiff expressly reserves his right to appeal any pre-Rule 68 Offer of Judgment rulings, including without limitation the December 14, 2005 Order and the August 9, 2005 Order, as provided as law." On January 26, 2006, a Praecipe was issued by the Superior Court stating that Choharis accepted State Farm's Offer of Judgment as a final judgment against State Farm for the breach of contract and assumpsit claims. The Praecipe also states that the "Defendant expressly reserves its right to challenge on appeal Plaintiff's right of appeal as to any rulings made prior to Defendant's Offer of Judgment."

## II. Bad Faith

The original trial judge granted State Farm's Motion to Dismiss Order dismissing the bad faith, conversion, and replevin claims as a matter of law. Choharis principally challenges the refusal to recognize a tort of bad faith by insurance companies in the handling of policy claims. He asserts that a number of jurisdictions have recognized such a tort [6] and that the District of Columbia should do the same.

▮ Although a common-law court, we are not persuaded that we should do so. An insurance policy establishes a contractual relationship between the company and its policy holder. Under District of Co-

lumbia law, every contract contains within it an implied covenant of both parties to act in good faith and damages may be recovered for its breach as part of a contract action. *See Murray v. Wells Fargo Home Mortgage,* 953 A.2d 308, 321 (D.C. 2008) and cases cited. Disputes relating to the respective obligations of the parties to an insurance contract should generally be addressed within the principles of law relating to contracts, and bad faith conduct can be compensated within those principles. We see no compelling basis for complicating matters by intertwining such disputes with considerations peculiar to tort. As discussed further *infra,* it appears to us that all the economic damages claimed by Choharis would, if proven, be compensable under his claim of breach of contract, which has been settled. If there is something special in the insurance relationship that calls for protection of policy holders beyond that provided by contract principles,[7] such a determination is one most appropriately to be made by the legislative body.[8]

▮ Choharis argues that District law already recognizes the tort he advocates, citing *Continental Ins. Co. v. Lynham,* 293 A.2d 481 (D.C.1972). We do not agree. *Lynham* simply deals with the propriety of the award of attorney's fees, under princi-

---

6. *See generally* 14 LEE R. RUSS & THOMAS F. SEGALL, COUCH ON INSURANCE 3d § 198:23 (2005); 6A JOHN ALAN APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 4032, at 40 (1972).

7. Choharis propounds, citing various authorities, that special elements of public interest, adhesion, and fiduciary responsibility are involved, suggesting, for example, that insurance companies have an incentive to violate the terms of a policy and take advantage of vulnerable insureds during times of catastrophic loss. All these matters are for the legislature to weigh.

8. The D.C.Code currently provides a statutory remedy for overdue payment of benefits and attorneys' fees for no-fault motor vehicle insurance. D.C.Code § 31–2410(c), (e) (2001). It also contains provisions for the imposition of fines and the revocation of licenses of fire and casualty companies for committing unfair claim settlement practices "with such frequency as to indicate a general business practice." D.C.Code §§ 31–2231.17(a), (c) – 2502.03(a)(5) (Supp.2008). See the recently enacted Maryland statute making it an unfair claim settlement practice for an insurer to fail to act in good faith in settling a claim. MD. CODE ANN., INSURANCE § 27–303(9) (Supp.2008).

ples applicable to contract actions as well as other litigation. A recent decision of the United States District Court for the District of Columbia explored at length the issue of the existence in this jurisdiction of a bad faith tort relating to insurance. *Fireman's Fund Ins. Co. v. CTIA–The Wireless Ass'n*, 480 F.Supp.2d 7 (D.D.C. 2007). Presenting an analysis with which we agree, the court reasserted the rejection of any such tort, a position that that court has consistently taken since its refusal to follow an early contrary decision. *Id.* at 9–10 (citing *Washington v. Group Hospitalization, Inc.*, 585 F.Supp. 517 (D.D.C.1984)). We are also inclined to agree with the views of our sister jurisdiction of Maryland [9] on the subject of a distinct tort of bad faith in first-party insurance disputes.[10] As was said in *Hartz v. Liberty Mut. Ins. Co.*, 269 F.3d 474, 476–77 (4th Cir.2001):

> Maryland has made a considered decision not to recognize a tort action for bad faith failure to settle with an insured. *Mesmer [v. Maryland Auto. Ins. Fund]*, 725 A.2d at 1058 ("A contractual obligation, by itself, does not create a tort duty. Instead, the duty giving rise to a tort action must have some independent basis.").

> The Maryland Court of Appeals has repeatedly held that the duty which is owed to an insured for failure to settle a claim sounds in contract and not in tort. *See, e.g., Jones v. Hyatt Ins. Agency,*

*Inc.*, 356 Md. 639, 741 A.2d 1099, 1107–08 (Md.1999)....

The trial court here correctly dismissed the count based on a distinct tort of bad faith.

### III. Fraud and Negligent Misrepresentation

█ The trial court granted State Farm's Motion for Partial Summary Judgment on the fraud and negligent misrepresentation claims, declining to recognize a tort action in a first party breach of contract situation. We review the grant or denial of a summary judgment motion *de novo*. *See Walton v. District of Columbia*, 670 A.2d 1346, 1353 (D.C.1996) (internal citation omitted).

█ Choharis asserts that the consequence of the ruling by the trial court insulates insurance companies from any tort liability in the handling of policy claims made by their insureds. Such an interpretation goes too far. An insurance company that, for example, slandered or assaulted an insured in the course of a claims dispute would not be immune from tort liability.[11] Many jurisdictions that disallow bad faith torts still allow other types of torts arising from the mishandling of claims. These torts may include many forms of fraud, invasion of privacy, intentional or negligent infliction of emotional distress, negligence, and conspiracy. *See* Couch on Insurance, *supra* note 6, at

---

**9.** In addition to Maryland, other states including Georgia, Kansas, Maine, Louisiana, Michigan, Minnesota, Missouri, New York, Oregon, and Pennsylvania have also refused to recognize the existence of a distinct tort action for breach of a good faith duty under a first-party insurance contract. 5 J.D. Lee & Barry A. Lindahl, Modern Tort Law: Liability and Litigation § 47:10 (2d ed.2002). Jurisdictions taking this approach "have done so either because an action on the contract or a statutory remedy was deemed sufficient." *Id.*

**10.** Historically, our common law derives from that of Maryland in the year 1801. *See West v. United States*, 866 A.2d 74, 79 n. 1 (D.C. 2005).

**11.** Likewise, an insurance company may be liable for fraud and misrepresentation in matters leading to the procurement of the contract, such as the coverage provided. *See, e.g., Mills v. Cosmopolitan Ins. Agency, Inc.*, 424 A.2d 43 (D.C.1980).

§ 204:7. Although we reject the broad claim of bad faith as a viable tort, a cause of action that could be considered a tort independent of contract performance is a viable claim, even in the insurance context. As has been said, the injury to the plaintiff must be "an independent injury over and above the mere disappointment of plaintiff's hope to receive his contracted-for benefit." *Tate v. Aetna Cas. & Sur. Co.*, 149 Ga.App. 123, 124, 253 S.E.2d 775, 777 (1979) (internal citation omitted). Put another way, the tort must exist in its own right independent of the contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship. The tort must stand as a tort even if the contractual relationship did not exist.

Thus, conduct occurring during the course of a contract dispute may be the subject of a fraudulent or negligent misrepresentation claim when there are facts separable from the terms of the contract upon which the tort may independently rest and when there is a duty independent of that arising out of the contract itself, so that an action for breach of contract would reach none of the damages suffered by the tort. *See Heckrotte v. Riddle*, 224 Md. 591, 168 A.2d 879, 882 (1961).[12] The issue here, then, is whether the acts upon which Choharis relies to establish his fraud and misrepresentations claims can be so characterized.[13]

With respect to these causes of action, Choharis broadly invokes the full course of conduct by State Farm in dealing with his several claims under the policy. In considerable part, these relate to delayed payments or refusal to make payments. However, even a "willful, wanton or malicious" breach of a contract to pay money cannot support a claim of fraud. *See Bragdon v. 2512 Assocs. Ltd. P'ship*, 856 A.2d 1165, 1173 (D.C.2004). Apart from these matters relating to payments, Choharis focuses on two principal alleged incidents of fraudulent or negligent misrepresentation. First, he points to Ruesink's statements about the unavailability of short-term housing which led him to live in a hotel for an extended period. But these statements and any duty with respect thereto related directly to the question of interim living expenses provided for in the contract. Added expense to Choharis resulting from the misstatements would fall within the realm of recoverable contract damages. Second, Choharis complains of the statements made relating to the mold condition. In particular, he asserts that State Farm's representations about the absence of mold when it knew mold might be a problem were made with knowing falsity

12. The fact, for example, that an insured alleges that the insurance company was negligent in the handling of a claim does not mean that there is a separate cause of action sounding in tort for negligence, but rather that the insured may recover damages therefor under a breach of contract theory. *See, e.g., Myers v. Firemen's Ins. Co. of Washington, D.C.*, 107 U.S.App. D.C. 22, 24, 274 F.2d 84, 86 (1959) (relied on by appellant). A historical distinction between nonfeasance and malfeasance has been noted but not proven to be a totally satisfactory or accepted principle. *See* W. Page Keeton, Prosser and Keeton on Torts § 92, at 658–62 (5th ed.1984).

13. Choharis does not challenge the dismissal of his replevin claim. He does assert that State Farm should be liable to him under a theory of conversion. We see no basis for such a holding. "The essence of a conversion is a wrongful taking or a wrongful retention of property after a rightful possession." *Shehyn v. District of Columbia*, 392 A.2d 1008, 1012 (D.C.1978). "Failure by a contracting party to pay the contract price or debt, however, is not conversion but merely breach of contract." *Brand Iron, Inc. v. Koehring Co.*, 595 F.Supp. 1037, 1040 (D.Md. 1984). *See also Coots v. Allstate Life Ins. Co.*, 313 F.Supp.2d 539, 542 (D.Md.2004).

or at least negligently. However, a duty of State Farm to be accurate in its assessment of the mold condition would flow basically from the contractual relationship. That is to say, the assertions directly related to an obligation arising under the contract; *viz.*, compensation for mold if it existed, and State Farm had no unique source of knowledge on the subject. Any misstatements with respect thereto which resulted in added expense to Choharis that he would not otherwise have had to bear would be potentially compensable under contract principles. And while Choharis alleges that the presence of mold created health hazards, he has not furnished evidence of any actual physical harm to himself from exposure to mold.[14]

## IV. Punitive Damages

 Choharis argues that the trial court erred in ruling that punitive damages are foreclosed as part of his damages under the breach of contract claim. In *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C.), *cert. denied*, 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982), we set forth at some length the controlling principles in this area of the law:

> It is well-recognized that punitive damages are not favored in the law. The most appropriate field for their application is the realm of tort actions generally; but even there, they are available only in cases which present circumstances of extreme aggravation. The defendant's tortious conduct must have been outrageous, characterized by malice, wantonness, gross fraud, recklessness, or willful disregard of the plaintiff's rights.

> Where the basis of a complaint is, as here, a breach of contract, punitive damages will not lie, even if it is proved that the breach was willful, wanton, or malicious. The rule in this jurisdiction is that only where the alleged breach of contract "merges with, and assumes the character of, a willful tort" will punitive damages be available. More precisely, the breach must merge with and assume the character of a willful tort.

(Internal citations omitted.) As we have already set forth, the actions complained of here cannot be characterized as ones that "merge with and assume the character of a willful tort;" that is, there is no independent tort into which the actions can "merge." *Id.* Choharis argues, however, that insurance companies are held to a higher standard in their contractual relationships which permit the imposition of punitive damages, even in direct first-party disputes between an insurer and its insured. He cites in particular *Group Hospitalization, supra*, 585 F.Supp. at 521. That case, of course, is not binding on us and rests its decision on the assumption that a separate tort of bad faith applicable to insurance companies exists in this jurisdiction. That approach, including the award of punitive damages in insurance contract disputes, has subsequently been consistently (and correctly) rejected by a series of district court cases, most recently in the above-cited case of *Fireman's Fund Ins. Co.* and cases cited.[15] Again, if special

---

14. Choharis also complains about the referral of his claim to the Special Investigation Unit. While this might have delayed the processing of his claim, we are unable to perceive what damages he is entitled to for this unusual action apart from contract damages.

15. We do not exclude the possibility of fiduciary principles coming into play in certain

third-party situations, such as where the insurance company is involved in a settlement of a third-party claim or directs the actual course of the defense. *See McCauley v. Suls*, 123 Md.App. 179, 716 A.2d 1129, 1133 (1998); *Fireman's Fund Ins. Co., supra*, 480 F.Supp.2d at 14.

burdens in contract dealings are to be placed upon insurance companies, it is the legislature that should be making that determination.

## V. Amendment of the Complaint

 "Undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by previous amendments, and undue prejudice to the opposing party are all valid grounds for refusing to allow [an] amendment [to a pleading]." *Howard Univ. v. Good Food Servs., Inc.*, 608 A.2d 116, 120 (D.C.1992). In exercising its discretion to grant leave to amend, "[a] trial court should consider 'the number of such requests, the length of the pendency of the trial, the number of previous continuances, the existence of bad faith or dilatory motive, the merit of the [pleading] ..., and the existence of prejudice to the other party.'" *Bennett v. Fun & Fitness of Silver Hill, Inc.*, 434 A.2d 476, 478–79 (D.C.1981) (internal citation omitted). This was Choharis's first request, the trial had not been scheduled at the time the motion was filed, and there were no previous continuances. However, consideration of the remaining factors leads us to the conclusion that the trial court did not abuse its discretion in denying the motion to amend.

 "A motion to amend should be liberally granted." *Virginia Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1239 (D.C.2005). However, "[t]he lateness of a motion for leave to amend ... may justify its denial if the moving party fails to state satisfactory reasons for the tardy filing and if the granting of the motion would require new or additional discovery." *Id.* (internal citation omitted). The trial court also indicated that it suspected dilatory tactics on Choharis's part. The motion to amend came over a year after the filing of the complaint and some months after the ruling dismissing the bad faith tort as a matter of law and also after the grant of partial summary judgment and the closing of discovery. The filing of a motion when defeat seems imminent is "suggestive of an unacceptable dilatory approach." *Sherman v. Adoption Ctr. of Washington, Inc.*, 741 A.2d 1031, 1039 (D.C.1999) (internal citation omitted). Also, the trial court addressed the merits of the proposed amended complaint and concluded that this factor weighed against Choharis. The proposed new contract claim was basically cumulative and the remaining amendments, sounding in tort, were variants on the tort claims upon which summary judgment had been granted.[16] No compelling new facts appear to have come to light that could not be known previously.[17] And finally, with respect to prejudice, the addition of seven new counts after discovery had closed, however cumulative, would, as the trial court noted, "be likely to result in further disputes and motions practice, prejudicing both defendant and the Court itself."

 "We review a trial court's decision to grant or deny leave to amend for abuse of discretion. The court has wide discretion in such matters. In the absence of manifest error, amounting to an abuse of that discretion, the decision of the trial court to grant or deny such motion is not reviewable on appeal." *Id.* (internal citation and quotation marks omitted). Applying this standard of review, we are unable

---

16. In particular, the specification of five individual elements of the asserted tort of bad faith added nothing significant.

17. The amended complaint did contain assertions about an asbestos problem revealed during discovery, but the basic theories of recovery relating thereto were not novel.

to fault the trial court's denial of Choharis's motion to amend.

For the foregoing reasons, the judgment appealed from must be, and is hereby,

*Affirmed.*