*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## No. 19-CV-1160

VAN YERRELL, APPELLANT,

V.

EMJ REALTY COMPANY, T/A FRED A. SMITH COMPANY, AKA CCP, LLC, APPELLEE.[*]

Appeals from the Superior Court of the
District of Columbia
(CAB-7333-17)

(Hon. Kelly A. Higashi, Trial Judge)

(Argued May 26, 2021                          Decided September 1, 2022)

*Christopher G. Hoge* for appellant

*Sarah W. Conkright* for appellee

Before BLACKBURNE-RIGSBY, *Chief Judge*, MCLEESE and DEAHL, *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*: This appeal arises from a general contract dispute between property owner appellant Van Yerrell and property

---

[*] Appellee asserts that its correct legal name is CCP, LLC. As appellant does not contest this fact, the case caption has been changed to include appellee's legal name. However, this opinion continues to refer to appellee as EMJ Realty for consistency with the Superior Court's order.

management company appellee EMJ Realty Company, LLC. The issues raised on appeal are whether the trial court erred in 1) dismissing his negligence claim as duplicative of the breach of contract claim, and 2) finding that the three-year statute of limitations barred appellant from pursuing his breach of contract claim, D.C. Code § 12-301(7). We affirm.

## I.    Facts

Yerrell and EMJ's predecessor, Capitol City Properties, Inc., ("Capitol City") entered into a contract, which stated that Capitol City would manage a small apartment building located at 2820 Pennsylvania Avenue, Southeast. On July 18, 2003, Yerrell and Capitol City entered into a second contract for the management of another small apartment building at 5503 Nannie Helen Burroughs Avenue, Northeast. On June 11, 2011, Capitol City assigned all leases and management agreements to EMJ, which then assumed responsibility for performance of the two contracts with Yerrell.[1]

EMJ's responsibilities under the contracts included collecting rents, advertising available rental properties, executing and renewing leases, making

---

[1] Yerrell does not dispute that Capitol City had authority under the contract to make this assignment to EMJ.

repairs, supervising the maintenance and operations employees, and handling tenants' security deposits. EMJ was also required to "render monthly statements of receipts, expenses, and charges" to Yerrell. In exchange, EMJ received six percent of all gross receipts collected. Both contracts included an identical disclaimer clause, which stated that the property manager "shall not be liable for any errors of judgment, mistake of fact or law, or anything which the Agent may do or refrain from doing, except in cases of willful misconduct or gross negligence." Both contracts automatically renewed on an annual basis, unless either party terminated the agreement by giving the other party written notice.

Yerrell stated in response to interrogatories that, in 2012, he began noticing "numerous failures and deficiencies regarding both properties" based on his review of the monthly ownership statements. Yerrell asserted that he noticed uncollected fees, delinquent repairs, and high vacancy rates. In 2012 and 2013, Yerrell made multiple phone calls and sent multiple emails to two of EMJ's representatives complaining about these issues. In some instances, Yerrell stated that he received responses from EMJ's representatives regarding his suggestions for corrective action. In those instances, EMJ's representatives expressed agreement with Yerrell and promised corrective actions, but ultimately did not implement any of his suggestions. In other instances, Yerrell stated that his emails and follow-up phone

calls went unanswered or ignored. As a result, Yerrell stated that he began personally managing contractors to correct delinquent repairs for both properties and re-rented apartments himself, with the help of his resident manager, to mitigate high vacancy rates.

In 2014, a representative of EMJ notified Yerrell that they intended to terminate the contracts on September 30, 2014. However, Yerrell indicated that he wanted to continue the contractual relationship. EMJ therefore sent Yerrell a new contract on September 15, 2014, which removed certain provisions that required them to share late fees with Yerrell. Yerrell declined to sign the new agreement, and on October 31, 2014, the parties mutually terminated their contractual relationship.

Three years later, on October 27, 2017, Yerrell filed a complaint against EMJ for breach of contract and negligence. Yerrell alleged several contractual breaches that occurred prior to October 31, 2014, including that EMJ failed to 1) collect the appropriate amounts of rent from tenants, 2) properly assess, collect, and remit to appellant certain fees, 3) properly assess and collect rental increases, 4) properly disburse collected security deposits, and 5) timely pay utility bills and other building expenses. Yerrell did not allege specific examples of harms on specific dates.

Rather, he alleged that harm occurred generally during his contractual relationship with EMJ.

EMJ moved for summary judgment, arguing that 1) the claims were barred by both the statute of limitations, D.C. Code § 12-301(7), and the exculpatory clauses in the contracts, and 2) Yerrell failed to offer evidence of damages. With respect to the statute of limitations defense, EMJ asserted that Yerrell's cause of action accrued in 2012, when Yerrell became aware of the alleged conduct constituting breach of contract and/or duty. EMJ therefore contended that Yerrell's suit was barred by the three-year statute of limitations. Yerrell contended that the general accrual rule applicable to breach of contract cases did not apply because EMJ was still providing uninterrupted services to him until the termination of the contract on October 31, 2014. In support of this position, Yerrell sought to invoke the "continuation of services" doctrine, which is a Maryland common law principle.

The trial court granted summary judgment for EMJ. First, the trial court sua sponte dismissed Yerrell's negligence claim as duplicative of the breach of contract claim. Second, the trial court rejected Yerrell's argument that his breach of contract claim did not accrue until his contractual relationship with EMJ ended, and therefore concluded that his breach of contract suit was barred by the three-year statute of

limitations. The trial court declined to apply the Maryland "continuation of services" doctrine and noted, sua sponte, that the District of Columbia recognizes a similar tolling rule, but only in the limited context of legal and medical malpractice claims. The trial court did not address the merits of EMJ's remaining arguments. This timely appealed followed.

## II. Analysis

We review the trial court's grant of summary judgment de novo. *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1033 (D.C. 2015). Summary judgment is proper if "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Tiger Steel Eng'g, LLC v. Symbion Power, LLC*, 195 A.3d 793, 797 (D.C. 2018) (citations omitted). "In the absence of material issues of fact, expiration of the statute of limitations is a question of law, which we review de novo." *Id.* (internal quotations, brackets, and citations omitted).

On appeal, Yerrell argues that the trial court erred by 1) dismissing his negligence claim, and 2) concluding that his breach of contract claim was time-barred by the statute of limitations. With respect to Yerrell's latter argument, there is no dispute that he filed his claim more than three years after he became aware of

the conduct constituting the alleged breaches. Therefore, the issue left for us to decide is whether the trial court failed to apply a rule that would toll the statute of limitations. For the reasons discussed below, we affirm the trial court's conclusions that Yerrell's negligence claim is duplicative of his breach of contract claim and that no discernible exception applies to toll the three-year statute of limitations in this case. As a result, Yerrell's breach of contract claim was untimely filed, and the trial court did not err in granting summary judgment.

**A.    Appellant's Negligence Claim is Duplicative of his Breach of Contract Claim**

We begin by addressing Yerrell's argument that the trial court erroneously dismissed his negligence claim as duplicative of his claims for breach of contract. While "a cause of action that could be considered a tort independent of contract performance is a viable claim," the "injury to the plaintiff must be an independent injury over and above the mere disappointment of plaintiff's hope to receive his contracted-for benefit." *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008) (internal quotation and citation omitted); *see also Ludwig & Robinson, PLLC v. BiotechPharma, LLC*, 186 A.3d 105, 110 (D.C. 2018). In other words, "the tort must exist in its own right independent of the contract, and any duty

upon which the tort is based must flow from considerations other than the contractual relationship." *Choharis*, 961 A.2d at 1089. "The tort must stand as a tort even if the contractual relationship did not exist," *id.*, and "a breach of contract claim may not be recast as a tort claim." *EDCare Mgmt. v. Delisi*, 50 A.3d 448, 449 (D.C. 2012) (citing *Choharis*, 961 A.2d at 1089). [2]

The trial court found that Yerrell's negligence claim asserted that "[EMJ]'s breaches of its duties as set forth in paragraph 10, [which is a recitation of EMJ's contractual duties] constituted breaches of its duty of care." The trial court therefore concluded that Yerrell's "negligence claim is entirely duplicative of [his] contract claims and entirely dependent on the contract." On appeal, Yerrell asserts that EMJ acted as his agent and fiduciary, and the trial court erred by failing to consider

---

[2] Yerrell takes issue with the trial court's reliance on *Choharis* and *Ludwig*, arguing that they are "inapposite and do not support the dismissal" because "there was no element of fiduciary duty involved" in *Choharis* and the defendant in *Ludwig* "was not an agent" of the plaintiff and "had no fiduciary duty." We, like the trial court, rely on these cases for the general principle that a tort claim must be independent of a breach of contract. As this court made clear in *Choharis*, to state a viable tort claim, in addition to a breach of contract, there must be "facts separable from the terms of the contract upon which the tort may independently rest." 961 A.2d at 1089. "The fact, for example, that an insured alleges that the insurance company was negligent in the handling of a claim does not mean that there is a separate cause of action sounding in tort for negligence, but rather that the insured may recover damages therefor under a breach of contract theory." *Id.* at 1089 n.12.

whether there was an independent tort claim based on a fiduciary relationship between the parties. Yerrell argues that this fiduciary relationship is based on the agency relationship between a property manager and property owner, as recognized by 17 D.C.M.R. § 2699.1 (defining property manager as "an agent for the owner of real estate in all matters pertaining to the operation of the property or properties which are under his or her direction . . . ."). Assuming, arguendo, that EMJ had an independent duty of care based on its provision of property management services, Yerrell's complaint does not allege a breach of that independent duty. Yerrell's negligence claim explicitly alleges that EMJ's breaches of its *contractual duties* "constituted breaches of its duty of care." The alleged tort, as claimed by Yerrell, therefore does not "exist in its own right independent of the contract," and we affirm the trial court's dismissal of his negligence claim, as it was duplicative of his contract claim. *See Choharis*, 961 A.2d at 1089.[3]

---

[3] We note Yerrell's assertion that the trial court "*sua sponte* dismissed" his claim for negligence because EMJ never argued, in its summary judgment motion, that the negligence claim was duplicative of the contract claim. However, Yerrell does not challenge the trial court's decision on procedural grounds, and we therefore do not consider whether the trial court erred by granting summary judgment on a ground it raised sua sponte. *See Rose v. United States*, 629 A.2d 526, 535 (D.C. 1993) ("It is a basic principle of appellate jurisprudence that points not urged on appeal are deemed to be waived.").

**B.      Statute of Limitations**

"Except as otherwise specifically provided by law," an action may not be brought with respect to a simple contract after the expiration of three years from the time the right to maintain the action accrues. D.C. Code § 12-301(7). "A cause of action for breach of contract accrues, and the statute of limitations begins to run, at the time of the breach." *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1004 (D.C. 2008) (ellipses omitted) (quoting 1 CALVIN W. CORMAN, LIMITATION OF ACTIONS, § 7.2.1, at 482 (1991)). "A contract is breached if a party fails to perform when performance is due, i.e., upon a party's unjustified failure to perform all or any part of what is promised in a contract entitling the injured party to damages." *Medhin v. Hailu*, 26 A.3d 307, 310 (D.C. 2011) (internal quotations and citations omitted).

"Under the 'discovery rule,' however, a breach of contract claim does not accrue, and the statute of limitations period does not begin to run, until the plaintiff knows, or in the exercise of reasonable diligence should know, of the injury." *Radbod v. Moghim*, 269 A.3d 1035, 1044 (D.C. 2022) (internal quotation and citation omitted). But the limitation period "is not delayed simply because the claimant does not know (or cannot be charged with knowledge of) the full 'breadth

or nature' of the defendant's wrongdoing." *Medhin*, 26 A.3d at 310 (quoting *Brin v. S.E.W. Invs.*, 902 A.2d 784, 792 (D.C. 2006)). "The question turns on when the claimant had 'inquiry notice that she might have suffered an actionable injury.'" *Id.* (quoting *Bussineau v. President & Dirs. of Georgetown Coll.*, 518 A.2d 423, 428 (D.C. 1986)).

The trial court found that Yerrell conceded his awareness of EMJ's conduct that allegedly constituted a breach of contract before October 2014. The trial court further found that Yerrell failed to dispute EMJ's assertion that he recognized the alleged lack of performance by 2012. Additionally, Yerrell admitted to noticing "issues" with EMJ's management of the properties beginning in 2012, and continuing through 2013-2014. In light of these concessions, the trial court found no dispute that Yerrell filed his complaint against EMJ more than three years after his cause of action accrued, and concluded that no exception applied to toll the statute of limitations.

On appeal, Yerrell does not dispute the trial court's findings or argue that any other material fact is in dispute. For example, he does not identify any specific instance of a breach of contract that occurred within the three years before he filed

his complaint.[4] Instead, he urges this court to apply the "continuous representation" rule to toll the statute of limitations until the parties' contractual relationship terminated.

Although Yerrell did not make this precise argument below, the trial court considered the issue, sua sponte, in an effort to determine "whether any rule would apply to toll the statute of limitations in this case," and concluded that the continuous representation doctrine did not apply. EMJ contends that Yerrell's continuous representation argument should not be considered on appeal because "arguments not raised in the trial court are not usually considered on appeal." *Fleet v. Fleet*, 137 A.3d 983, 992 (D.C. 2016) (quoting *Jordan v. Jordan*, 14 A.3d 1136, 1153 (D.C. 2011)). However, Yerrell's central argument before the trial court was substantially similar; there, he also argued that the statute of limitations period should not begin to run until the parties' contract was terminated, albeit based on a different legal theory, which we briefly discuss below. Moreover, we see no reason to avoid

---

[4] Such an instance would have had to occur in the four-day window before the parties terminated their contract, since the contract was terminated on October 31, 2014, and Yerrell filed his complaint on October 27, 2017. Yerrell's complaint alleges that EMJ "failed to perform its contractual duties" "[d]uring its contractual relationship with" him. However, Yerrell does not specifically argue that this allegation should be construed to mean that breaches were occurring constantly on each day the contractual relationship was in place.

addressing this argument in these circumstances, where the trial court reached the issue and both parties have briefed the issue on appeal.[5]

### 1.    Tolling Rules

In his opposition to summary judgment, Yerrell argued that the statute of limitations period did not begin until October 31, 2014, when the parties terminated their contract.  In support of that argument, Yerrell relied on the "continuation of services" theory, as articulated by the Maryland Court of Appeals in *Booth Glass v. Huntingfield Corp.*, 500 A.2d 641, 643-44 (Md. 1985).  In *Booth Glass*, the Maryland Court of Appeals recognized that "in cases where there is an undertaking which requires a continuation of services[,] . . . the statute begins to run only from the time the services can be completed." *Id.* at 644 (citing *Wash., B. & A. Elec. R.R. v. Moss*, 100 A. 86, 89 (Md. 1917)).  The *Booth Glass* court also acknowledged that "if the subject of a suit is an undertaking or event that is continuing in nature, the time of accrual of the cause of action will be the date upon which the continuing event is completed." *Id.*  More recently, Maryland courts have described this rule as

---

[5] "It would have been preferable for the [trial] court to defer ruling on the motion for summary judgment, raise the issue with both parties, and give them adequate time to respond before deciding the motion." *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1038 (D.C. 2014).

the "continuation of events" theory, "a corollary accrual doctrine, which serves to toll the statute of limitations where a continuous relationship exists between the parties." *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 756 A.2d 963, 974 (Md. 2000). The rule has been applied to toll a statute of limitations in cases involving "a relationship which is built on trust and confidence" and serves to "give[] the confiding party the right to relax his or her guard and rely on the good faith of the other party so long as the relationship continues to exist." *Id.* at 975.[6]

Based on similar principles, this court has adopted a rule to toll the running of a statute of limitations in the limited context of legal and medical malpractice claims, which we have dubbed the "continuous representation" or "continuous treatment" rule. *See Beard v. Edmondson & Gallagher*, 790 A.2d 541, 546 n.8 (D.C. 2002); *Anderson v. George*, 717 A.2d 876, 877-78 (D.C. 1998); *R.D.H. Commc'ns, Ltd. v. Winston*, 700 A.2d 766, 768 (D.C. 1997). In a legal malpractice action, "when the injury to the client may have occurred during the period the attorney was retained, the malpractice cause of action does not accrue until the attorney's representation

---

[6] Yerrell argued before the trial court that, under Maryland's "continuation of services" or "continuation of events" rule, his claim did not accrue until the contract was terminated. However, he has not renewed this argument on appeal and we therefore consider it waived. *Rose*, 629 A.2d at 535.

concerning the particular matter in issue is terminated." *R.D.H.*, 700 A.2d at 768

(citing *Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992, 995 (D.C. 1978)).

"The rule's primary purpose is to avoid placing a client in the untenable position of

suing his attorney while the latter continues to represent him." *Id.* (quoting *Williams*

*v. Mordkofsky*, 901 F.2d 158, 163 (D.C. Cir. 1990)). Similarly, "in medical

malpractice actions involving continuing treatment for the same or related illness or

injury, the cause of action is tolled until the doctor ceases to treat the patient in the

specific matter at hand." *Anderson*, 717 A.2d at 878.


"The reasoning behind the continuous representation rule is similar to that of

the continuous treatment rule in medical malpractice actions and, in fact, the

continuous representation rule is often considered an adaption of the latter doctrine."

*R.D.H.*, 700 A.2d at 769. "Both relationships (physician/patient and attorney/client)

are marked by trust and confidence, present an aspect not sporadic but developing,

and both the patient and the client are necessarily at a disadvantage to question the

reason for the tactics employed or the manner in which the tactics are executed." *Id.*

at 770 (internal quotations and citation omitted). In the context of medical

malpractice, we have reasoned that "the statute of limitations must be tolled in such

situations because 'it would be ludicrous to expect a patient to interrupt a course of

treatment by suing the delinquent doctor.'" *Anderson*, 717 A.2d at 878 (quoting

*R.D.H.*, 700 A.2d at 770). Likewise, in the legal malpractice context, "the rule is based on respect for the attorney/client relationship and the desire, if the client so chooses, to avoid unnecessarily disrupting the representation in which the error occurred." *R.D.H.*, 700 A.2d at 769.

### 2. Applicability of Tolling Rules to This Case

The trial court declined to apply Maryland's "continuation of services" rule, and Yerrell has not renewed that argument on appeal. Considering, sua sponte, the applicability of the continuous representation and continuous treatment rules to the present case, the trial court concluded that this is not a professional malpractice case, and malpractice exceptions to the statute of limitations are, thus, inapplicable. Yerrell now takes the opportunity to argue that this *is* a professional malpractice case akin to legal or medical malpractice because property managers are a regulated profession in the District of Columbia,[7] require specialized skill, and owe a fiduciary

---

[7] Yerrell points to 17 D.C.M.R. § 2699.1 (defining a property manager as "an agent for the owner of real estate in all matters pertaining to the operation of the property or properties which are under his or her direction") and *id.* § 2603.1 (requiring property managers to pass an exam in order to be licensed).

duty to property owners.[8]  Yerrell argues that his relationship with EMJ (as property owner and property manager) was therefore more similar to an attorney-client fiduciary relationship than to a "run-of-the-mill arms' length contract," and urges this court to apply the continuous representation rule as a tolling mechanism.[9]

We decline to apply the continuous representation rule in this case.  As a preliminary matter, we are not aware of any binding precedents applying the continuous representation rule to a relationship other than one between an attorney and client or a doctor and patient, let alone a contractual relationship between two business entities.  And while we do not foreclose the possibility that the doctrine might extend to other relationships,[10] we conclude that the reasons supporting the application of the continuous representation rule in the limited contexts of legal and medical malpractice are not present here.

---

[8] Yerrell relies on 17 D.C.M.R. § 2609.11, which provides that property managers "shall exercise fidelity and good faith to a client in all matters within the scope of the licensee's employment."

[9] For simplicity, we use the term "continuous representation" to collectively describe the tolling rules applied in the legal and medical malpractice contexts.

[10] *See De May v. Moore & Bruce, LLP*, 584 F. Supp. 2d 170, 185 (D.D.C. 2008) (concluding that the continuous representation rule applied to a trustee/beneficiary relationship).

A property owner is not "necessarily at a disadvantage to question the reason for the tactics employed or the manner in which the tactics are executed" by a property manager, *Anderson*, 717 A.2d at 878, especially where, as here, the dispute is between two sophisticated business parties and concerns the breach of a commercial contract. Indeed, Yerrell repeatedly questioned EMJ's tactics in managing his properties and eventually took it upon himself to correct delinquent repairs and re-rent vacant apartments. By contrast, in an attorney-client and doctor-patient relationship, the client or patient is not typically positioned to step into the shoes of their attorney or doctor if they are dissatisfied with the services they are receiving, and are therefore reliant on the ongoing relationship. The continuous representation rule ensures that clients and patients are not disadvantaged by their reliance on an attorney or doctor by allowing them to preserve an avenue to redress their legal rights.

Furthermore, any harm or disruption associated with a property owner terminating his relationship with a property manager is minimal compared to the harm that could arise from prematurely ending an attorney-client or doctor-patient relationship. We have explained that, without the continuous representation in the legal malpractice context,

> we would force the client into one of two scenarios. If the client chooses to retain his attorney, he risks the possibility

> that during such representation the statute of limitations would expire (because the client "discovered" the alleged negligence and three years passed) and thus he risks foregoing redress of his legal rights. If the client chooses not to stay with his original attorney he must sue that attorney for malpractice (and presumably hire a new attorney to remedy the error in the underlying case thus causing a major disruption to the underlying case).

*R.D.H.*, 700 A.2d at 773. The rule is equally important in many medical malpractice scenarios because a patient might risk their health if they sued their doctor in the midst of medical treatment and had to find a new doctor. While we do not doubt that it would have been inconvenient if the parties' contractual relationship ended and Yerrell was compelled to find a new property manager, we have no reason to believe that any associated disruption would rise to the level of forgoing one's legal rights or risking one's health.

Yerrell also argues, as a matter of policy, that imposing the statute of limitations on disputes that arise during an ongoing services agreement would "encourage a rush to file suit" and would discourage parties from attempting to resolve disagreements on their own. We do not see such a risk. The statute of limitations for breach of contract claims is three years. This period gives parties time to discern whether their issues are likely to be resolved without litigation before resorting to the courts.

### III.   Conclusion

Having discerned no applicable rule that would toll the statute of limitations for Yerrell's breach of contract action,[11] we conclude that his breach of contract claim was untimely filed.  We reiterate that Yerrell has never disputed that he was on notice of EMJ's alleged lack of performance under the contract more than three years before he filed his complaint.  Due to his concession and failure to assert a viable legal exception that would toll the statute of limitations for breach of contract, we hold that the trial court's grant of summary judgment was proper.

Therefore, based on the foregoing, the judgment of the trial court is hereby

*Affirmed*.

---

[11] Yerrell also argues that the statute of limitations should be tolled because he suffered a "continuing tort."  This argument was not raised before the trial court, nor did the trial court reach the issue.  As stated above, such claims are generally not addressed on appeal.  *See Thornton v. Norwest Bank of Minn.*, 860 A.2d 838, 842 (D.C. 2004).  In any event, because we conclude that the negligence claim was properly dismissed, there is no basis for Yerrell's argument that he suffered a "continuing tort."