*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CV-1214

LUDWIG & ROBINSON, PLLC, APPELLANT,

v.

BIOTECHPHARMA, LLC, *et al.*, APPELLEES.

FILED 06/7/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CAB-884-13)

(Hon. Brian Holeman, Trial Judge)

(Argued March 16, 2017                    Decided June 7, 2018)

*Robert W. Ludwig*, with whom *Salvatore Scanio* and *James E. Tompert* were on the brief, for appellant.

*Albert Wilson, Jr.*, with whom *Lily A. Graves* was on the brief, for appellees BiotechPharma, LLC, Converting Biophile Laboratories, Inc., and Raouf Guirguis.

*Jeffrey S. Jacobovitz* for appellee Martin Kalin.

Before GLICKMAN, FISHER, and THOMPSON, *Associate Judges*.

THOMPSON, *Associate Judge*: Appellant Ludwig & Robinson PLLC ("L&R" or "the law firm") appeals from the Superior Court's dismissal of its claims alleging fraud and conspiracy by defendants/appellees BiotechPharma, LLC ("BTP"), BTP's wholly-owned subsidiary Converting Biophile Laboratories, Inc.

("CBL"), BTP's principal Raouf Guirguis (together, the "BTP defendants"), and Martin Kalin (alleged to be a BTP lender "who has held himself out" as BTP's "Executive Vice President"). For the reasons set out below, we reverse and remand.

## I. **Background**

L&R's complaint alleges that in 2011, BTP engaged the law firm's services to provide the company with "advice and representation regarding cross-border intellectual property claims." The engagement, which entailed extensive motions practice in the Eastern District of Virginia (the "Rocket Docket") and elsewhere as well as depositions and interviews "across the country and overseas," began after Kalin contacted L&R seeking representation for the company. On March 4, 2011, BTP, through Guirguis, executed an engagement letter that set out L&R's hourly rates and specified a monthly billing schedule. The engagement letter provided that bills would be "due and payable upon receipt" and stated that "[i]n the event of nonpayment, the [f]irm reserves the right to withdraw from representation in this matter."

On April 25, 2011, after L&R had begun its work (including drafting a complaint for misappropriation), Kalin "sought [an] alternate billing" arrangement, and L&R and BTP signed a modified engagement letter under which L&R agreed to defer half its hourly rates and BTP agreed to pay the law firm's deferred fees plus 30% upon settlement of the misappropriation action or upon "[a]ny cumulative investment in BTP exceeding $500,000." Over the next several months, L&R continued to provide legal services to BTP but received little by way of payment for those services. On January 19, 2012, L&R held a meeting with Guirguis and Kalin during which it "raised BTP's ongoing failure to pay" its legal fees. L&R told Guirguis and Kalin "to expect larger bills for round-the-clock work and expenses . . . until the case was settled or tried." L&R "conveyed [that] its lawyers would not work without pay" and said that they would "be forced to move to withdraw absent payment." Guirguis and Kalin "represented BTP would pay past bills, and $40,000 a month for December [2011] forward, through . . . CBL[] or [through] investment in BTP."

Payments were not made, however, and, in early February, after L&R reminded Guirguis and Kalin that it would "need . . . a revised fee arrangement if [it was] to continue representation in light of mounting legal fees and costs," Guirguis "agreed to pay at least $75,000 a month for December forward." On

February 28, 2012, "to account for further deferred payment and risk," L&R and BTP entered into a second modification to the engagement letter, "signed by Guirguis and copied to Kalin." Pursuant to the second modification letter, "BTP agreed to increase L&R's success fee to 50% of deferred fees, with guarantees . . . by CBL and Guirguis." Thereafter, although "L&R sent monthly invoices . . . showing [its] fees and expenses[] [with] detailed descriptions[] and time" reports, BTP "did not pay any $75,000 payment for December [2011] through May [2012]."

On January 31, 2013, after attempts to collect payment proved unsuccessful, L&R brought suit in the Superior Court, suing BTP for breach of contract (Count I); CBL and Guirguis for breach of guarantee (Count II); each of the BTP defendants for "Failure to Pay Accounts Stated" (Count III); and all defendants for fraud (Count IV), and conspiracy (Count V). The complaint alleges that as of June 5, 2012, BTP had incurred but failed to pay hourly fees of $1,233,683.08, a "success fee" of $358,659.96, and expenses of $196,605.67, for a total of $1,788,948.71.

Of particular note given the issues before us, the fraud count (Count IV) against all of the defendants/appellees alleges that Guirguis (on behalf of BTP and

CBL) and Kalin represented, over the period from October 2011 to May 2012, including "[b]efore, during, and after the January 19[, 2012,] meeting," that "L&R would be paid from CBL's revenue and credit line," thus "representing [that] . . . the credit line existed," even though at all relevant times CBL had no credit line. Count IV further alleges that these representations, as well as the representations regarding the large monthly payments from December 2011 forward, "were made with the intent to deceive L&R." Count IV alleges in addition that the defendants "concealed BTP's true financial condition, failing to disclose Kalin's actual investment in or loans to BTP, its indebtedness to lenders, and the fact and magnitude of liens." The foregoing representations and omissions, Count IV alleges, "induced [L&R] to continue work," as the law firm relied upon them "in deciding not to seek to withdraw as counsel on January 19, 2012[,] and thereafter, and in deciding not to require security against nonpayment of fees and expenses . . . upon entering [into] the [s]econd [m]odified [e]ngagement [l]etter on February 28, 2012." Count IV includes a prayer for "damages in the amount of services rendered and billed, but not paid, with interest from when payment was due, attorney's fees, and any other appropriate relief." Count V contains similar allegations and a similar prayer for relief, including a prayer for "attorney's fees and expenses under Counts IV and V."

The Superior Court action was stayed while the contract claims against the BTP defendants proceeded to arbitration before the Attorney-Client Arbitration Board ("ACAB"), as requested by BTP. On February 11, 2015, the ACAB awarded L&R $908,000 on its claim for "approximately $1.79 million in fees and expenses, plus interest."

The Superior Court granted L&R's motion to confirm the arbitration award and entered judgment for $908,000 against BTP, CBL and Guirguis jointly and severally. On June 22, 2015, the court held a hearing on pending matters. L&R initially told the court that "[i]f the arbitration award by ACAB had been complied with . . . the complaint would be moot." Shortly thereafter, however, saying that it had "misspoke[n]" earlier, L&R argued that its claims for fraud and conspiracy against the BTP defendants and Kalin should proceed. The court readily disagreed as to the BTP defendants, reasoning from the bench and in a June 23, 2015, written order that all of the counts of the complaint "were pled by L&R in order to recover its unpaid legal fees"; that the fraud and conspiracy claims "were disposed [of] when [the law firm was] compensated under the [ACAB] award" (which the court said had *res judicata* effect as to Counts I–III of the complaint ); and that L&R did not "have a separate right to compensation [from the BTP defendants] based on claims of fraud and conspiracy." Without allowing L&R an opportunity for

briefing, the court dismissed the fraud and conspiracy claims against the BTP defendants.  The court postponed its ruling as to dismissal of the claims against Kalin (who was not a party to the ACAB proceedings), although it preliminarily suggested that the fraud and conspiracy claims against Kalin were "subsumed within the award of the arbitrator."  L&R had argued that the law firm was entitled to recover from Kalin if it could "show more than [the ACAB] award as damages as to [Kalin] up to the claimed 1.8 million dollars."  L&R told the court that it was "entitled to judgment against a co-defendant [Kalin] who may be more collectible than the BTP defendants," and it asserts in its brief that it has never been able to collect the ACAB award amount.

At an October 1, 2015, hearing, the Superior Court denied the law firm's motion to alter or amend the judgment dismissing the claims against the BTP defendants.  The court also dismissed the claims against Kalin, reasoning that L&R had, through the arbitration award, "received the relief it sought against the defendants, which was a money judgment essentially for payment for legal services previously rendered."  The court found "without merit" the arguments "that [the] ACAB had no jurisdiction over the fraud claim" and that "the arbitration award did not create *res judicata* effect" as to the fraud claim.  L&R explained that its request "for additional fees under a fraud and conspiracy theory . . . was

necessitated by [the defendants'] obstructive conduct" and pertained to "compensat[ion] for the need to pursue" and "chase" the BTP defendants "to honor [their] obligation." The court, however, characterized Counts IV and V as "alternative theories of relief for the exact same relief" that was "granted under the arbitration award."[1]

Finally, in an October 13, 2015, written order, the Superior Court explained its reasoning that "the fraud and conspiracy claims are wholly dependent upon the extant contract"; that L&R has not alleged "an independent injury over and above the mere disappointment of [its] hope to receive [its] contracted-for benefit"; that L&R's claimed damages were addressed in the breach of contract claim; and that "[t]here [was] no duty owed to [L&R] 'from considerations other than the contractual relationship.'" Oct. 13, 2015, Order at 7 (quoting *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008)).

L&R now appeals the dismissal of its claims for fraud and conspiracy against the BTP defendants and Kalin. As to the BTP defendants, L&R argues that dismissal of the Counts IV and V fraud and conspiracy claims was error because

---

[1] The court had earlier stated that the "five counts [of the complaint] were used in order to recover under separate causes of action the same dollar amount."

the law firm was "entitled to recover[] its reasonable attorney[s'] fees incurred in having to bring this suit as an additional item of damage" for appellees' "willful and wanton" "fraudulent and collusive conduct." Regarding Kalin, L&R argues that dismissal of the fraud and conspiracy claims against him was error because he is a "jointly and severally liable tortfeasor" against whom the law firm is entitled to obtain a separate judgment.[2] L&R contends that the holding in *Choharis*, which the Superior Court cited in denying the law firm's motion to alter or amend judgment, is inapplicable because of "fraud-in-the-inducement" and "difference-in-damages" exceptions *Choharis* recognized.

## II. Standard of Review

"We review an order granting a motion to dismiss de novo." *Hillbroom v. PricewaterhouseCoopers LLP*, 17 A.3d 566, 572 (D.C. 2011) (quoting *Chamberlain v. American Honda Fin. Corp.*, 931 A.2d 1018, 1022 (D.C. 2007)). As such, "we apply the same standard the trial court was required to apply, accepting the allegations in the complaint as true and viewing all facts and drawing

---

[2] *See Young v. District of Columbia*, 752 A.2d 138, 145 n.15 (D.C. 2000) (citing *R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin*, 596 A.2d 530, 544 (D.C. 1991)) ("Joint tortfeasors contributing to single injury may be jointly and severally liable to injured party.").

all reasonable inferences in favor of the plaintiffs." *Id.* (quoting *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 316 (D.C. 2008)).

## III. Analysis

This court stated in *Choharis* that "a cause of action that could be considered a tort independent of contract performance is a viable claim" if the tort "exist[s] in its own right independent of the contract[] and any duty upon which the tort is based . . . flow[s] from considerations other than the contractual relationship." 961 A.2d at 1089. We further explained that "conduct occurring during the course of a contract dispute may be the subject of a fraudulent . . . misrepresentation claim when there are facts separable from the terms of the contract upon which the tort may independently rest and when there is a duty independent of that arising out of the contract itself, so that an action for breach of contract would reach none of the damages suffered by the tort." *Id.* The latter clause means that a category of damages may be the subject of a fraudulent misrepresentation claim if it does not "fall within the realm of recoverable contract damages" and is not "potentially compensable under contract principles." *Id.* at 1089–90.[3]

---

[3] *See also Thermal Dynamics Int'l, Inc. v. Safe Haven Enters., LLC*, 952 F. Supp. 2d 143, 153 (D.D.C. 2013) ("The standard set forth in *Choharis*
(continued…)

As described above, the Superior Court reasoned that "[t]here [was] no duty owed to [L&R] 'from considerations other than the contractual relationship'" and that L&R had not alleged "an independent injury over and above the mere disappointment of [its] hope to receive [its] contracted-for benefit." Oct. 13, 2015, Order at 6–7 (quoting *Choharis*, 961 A.2d at 1089). We disagree as to both prongs of that reasoning.

We cannot agree that the defendants/appellees owed no duty to L&R "from considerations other than the contractual relationship." 961 A.2d at 1089. Our case law establishes that "[w]hen a person undertakes to make a statement in a business transaction, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells, but also not to suppress or conceal any facts within his knowledge which would materially qualify those stated." *Ehrlich v. Real Estate Comm'n*, 118 A.2d 801, 802 (D.C. 1955); *see also, e.g.*, *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 880 (9th Cir. 2007) (defendant "had an

---

(…continued)
is . . . dependent on . . . whether the damages the plaintiff allegedly suffered are compensable by a breach of contract claim."); *cf. Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) (noting that under New York law, "parallel fraud and contract claims may be brought if the plaintiff . . . seeks special damages that are unrecoverable as contract damages").

independent 'duty imposed by law' not to commit fraud, a duty not 'arising by virtue of the alleged express agreement between the parties'"); *Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 200 (D.D.C. 2016) ("Defendants . . . possessed a duty, independent of the [s]ales [c]ontract, to make truthful representations about the [p]roperty" advertised for sale);[4] *Morris v. Achen Constr. Co.*, 747 P.2d 1211, 1212–13 (Ariz. 1987) (en banc) (stating, in answer to the question "whether the fraud action between A and B is an action 'arising out of contract' because the alleged fraud caused A to enter into a contract with C," that "[t]he duty not to commit fraud is obviously not created by a contractual relationship and exists . . . even when there is no contractual relationship between the parties at all.").

---

[4] In *Jacobson*, the court rejected the contention that all of the plaintiff homeowners' fraudulent misrepresentation claims were "inappropriately duplicative of [their] breach of contract claim." 168 F. Supp. 3d at 199. The court explained that the claims arising from misrepresentations made during "negotiations involving the content and conditions of the [contract for the sale of the house]," including "a promise by [d]efendants to make 27 specific repairs before settlement," were "duplicative of [p]laintiffs' breach of contract claim and [could not] provide the basis for an actionable, independent tort." *Id.* By contrast, "misrepresentations that precede[d] the formation of the contract and [were] alleged to have induced plaintiffs to contract to purchase the property," including "false representations and omissions when advertising the [p]roperty," gave rise to an independent tort because "[p]laintiffs did not face mere contractual disappointment — [rather,] they entered into a contract to purchase a property that they would not have otherwise." *Id.* at 199–200 (emphasis in original omitted).

Here, the L&R-BTP relationship was an open-ended engagement; i.e., it had no fixed termination date. L&R's complaint alleges that the law firm reserved the right to "move to withdraw absent payment" and threatened to invoke that right when confronting Guirguis and Kalin about BTP's failure to pay billed amounts. The complaint further alleges that during those conversations, BTP (through Guirguis) and Kalin induced L&R to continue providing legal services to BTP under modified engagement letters, and thus not to withdraw, through false statements about payment sources available to pay the law firm's bills (e.g., CBL's purported credit line) and through omissions about "the fact and magnitude of liens" against BTP, loans by Kalin to BTP, and BTP's level of "indebtedness."[5] In

---

[5] These alleged financial misrepresentations and omissions are similar to ones that courts have held will support a claim of fraudulent misrepresentation. *See, e.g.*, *American Media, Inc. v. Bainbridge & Knight Labs., LLC*, 22 N.Y.S.3d 437, 439 (N.Y. App. Div. 2016) ("Ruderman's assurance that Bainbridge had an $850,000 account receivable from Walgreen's that was 'in the process of being paid' and 'would be used to pay [p]laintiffs' is alleged to have induced plaintiffs to continue to furnish advertising services under the contract. Ruderman's alleged misrepresentations as to Bainbridge's wherewithal and the condition of Bainbridge's finances constitute actionable fraud."); *Penn Anthracite Mining Co. v. Clarkson Sec. Co.*, 287 N.W. 15, 17 (Minn. 1939) ("[A] finding of fraudulent misrepresentation [was] imperative" where officials of the defendant company vouched for financial statements purporting to show the assets, liabilities, and financial condition of the company while knowing that a relatively large number of the reported accounts receivable were moribund or had been assigned as security for loans made to the company).

That said, some of L&R's allegations about statements by Guirguis and Kalin — such as the allegations that they stated BTP "would pay past bills, and
(continued…)

the context of these alleged transactions, the defendants/appellees had a duty independent of the subsequent modified engagement letters to "state truly what" they told the law firm and "also not to suppress or conceal any facts within [their] knowledge which would materially qualify those [representations] stated." *Ehrlich*, 118 A.2d at 802. L&R's complaint in Counts IV and V is about alleged fraud in the inducement, a claim that we recognized in *Choharis* is not duplicative of a contract claim. *See* 961 A.2d at 1088 n.11 ("[A]n insurance company may be liable for fraud and misrepresentation in matters leading to the procurement of the contract . . . ."); *see also Marvin Lumber & Cedar Co. v. PPG Indus.*, 223 F.3d 873, 885 (8th Cir. 2000) ("Courts generally agree that fraud in the inducement, necessarily prior to the contract, is independent of the contract . . . .").

We also cannot agree that, like the complaint in *Choharis*, L&R's complaint failed to allege "an independent injury over and above the mere disappointment of [its] hope to receive [its] contracted-for benefit." Oct. 13, 2015, Order at 6

---

(…continued)
$40,000 a month for December [2011] forward," and then that BTP would "pay at least $75,000 a month for December forward" — at least arguably do not support a claim of fraudulent inducement. "[P]romissory statements as to what will be done in the future . . . give rise only to a breach of contract claim," while "false representations of present fact . . . give rise to a separable claim of fraudulent inducement." *Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) (internal quotation marks and citation omitted).

(quoting *Choharis*, 961 A.2d at 1089). After broken pipes caused Mr. Choharis's home to sustain extensive water damage, he sued his homeowner's insurance company for its course of conduct in dealing with claims he made under the policy. He alleged that the insurance company misrepresented that there was no short-term rental housing available in his area (a misrepresentation that caused him to live in a hotel for an extended period) and knowingly or negligently made false "representations about the absence of mold when it knew mold might be a problem" in his house. 961 A.2d at 1089. After he settled with the insurance company on his breach of contract claim based on denial of coverage, the trial court dismissed his fraud and negligent misrepresentation claims against the insurer. We upheld that dismissal, reasoning that the insurance company's "statements and any duty with respect thereto related directly to the question of interim living expenses provided for in the contract"; that any "[a]dded expense to Choharis resulting from the misstatements would fall within the realm of recoverable contract damages"; that any "duty of [the insurance company] to be accurate in its assessment of the mold condition would flow basically from the contractual relationship" and was "directly related to an obligation arising under the contract[,] *viz.,* compensation for mold if it existed"; and that "[a]ny misstatements with respect thereto which resulted in added expense to Choharis

that he would not otherwise have had to bear would be potentially compensable under contract principles." *Id.* at 1089–90.

Mr. Choharis made no claim that, prior to Mr. Choharis's taking out the policy, the insurance company had made misrepresentations about (for example) the scope of the offered coverage or the financial strength of the company and its ability to meet its obligations under issued policies. We specifically recognized that in that very different circumstance, "an insurance company may be liable for fraud and misrepresentation in matters leading to the procurement of the contract." 961 A.2d at 1088 n.11.

We applied the principles set out in *Choharis* in *EDCare Mgmt., Inc. v. DeLisi*, 50 A.3d 448 (D.C. 2012). *EDCare*, too, is quite different from the instant case. The case arose from a dispute between a hospital called Capitol Medical Center, LLC ("CMC") and EDCare (an emergency-care management and administrative services company) and its subsidiary, The Greater Southeast Community Emergency Physicians, LLC ("GSCEP"). *Id.* at 449–50. GSCEP and CMC entered into a contract wherein CMC agreed to pay GSCEP a monthly stipend for recruiting and training emergency room physicians to provide services at the hospital. *Id.* In March 2009, after CMC had fallen behind on payments, the

parties agreed that the contract would terminate on May 31, 2009. *Id.* at 450. After CMC still did not pay, the case proceeded to arbitration. *Id.* The arbitral tribunal awarded GSCEP damages for breach of contract, "rul[ing] that the Hospital is liable to GSCEP for failing to pay for all of the services that GSCEP rendered to the Hospital." With CMC facing receivership, however, EDCare, the assignee of GSCEP's rights and obligations under the CMC contract, filed a fraudulent misrepresentation claim against DeLisi, CMC's CEO, "seeking to recover its out-of-pocket expenses suffered in reliance on DeLisi's allegedly fraudulent misrepresentations concerning CMC's ability to pay the debts owed under the CMC Contract." 50 A.3d at 450. EDCare alleged that DeLisi had "fraudulently induced EDCare to forego its right to terminate its obligations under the CMC Contract earlier than May 31, 2009," with assurances to GSCEP that "there [was] absolutely no reason to have concern regarding receiving payment in full for [GSCEP's] services" and that CMC was "expecting the hospital to be successful in collecting the significant funds due [it]." *Id.* The trial court granted summary judgment in favor of DeLisi, and we affirmed, agreeing that EDCare's claim was barred under the *Choharis* rule that "a breach of contract claim may not be recast as a tort claim." 50 A.3d at 449.

The record in *EDCare* shows that, in the GSCEP–CMC arbitration, GSCEP advanced both contract and tort claims, *see* 50 A.3d at 450, and alleged, *inter alia*, that CMC repeatedly made payment assurances but acted in bad faith. The record in *EDCare* also shows that the arbitration panel awarded GSCEP's claimed damages on its breach of contract claim but found that "GSCEP failed to carry its burden of proof" on its tort claim (for tortious interference). As this court explained in *EDCare*, EDCare and GSCEP were in privity, as were CMC and DeLisi, 50 A.3d 451–52, with the result that the arbitrator's decision posed a *res judicata* bar with respect to "not only claims that actually were litigated in the [arbitration] but all issues arising out of the same cause of action that could have been litigated" in that proceeding. *Id.* at 451 (internal quotation marks omitted). Further, *EDCare* recounts that DeLisi made the assurances alleged to have constituted fraudulent misrepresentations in an email on May 29, 2009, "a few days before the contract's [May 31, 2009,] termination date," *id.* at 450, at which time GSCEP was already obligated to perform under the contract. Thus, the alleged misrepresentations did not precede (and thus did not fraudulently induce) the contract, but were made during the fixed contract period, when, as this court said, "DeLisi had no duty independent of the CMC Contract to make any representations about CMC's financial circumstances or ability to make payment."

*Id.* at 452.[6]  Finally, our opinion in *EDCare* emphasized the EDCare CEO's admission "that had CMC made all the payments it owed to GSCEP, CMC would have 'fulfilled its obligations' to EDCare and 'we would not be sitting here today.'"  50 A.3d at 450.  Therefore, we said (in setting out an alternative basis for upholding the dismissal of EDCare's claim), EDCare's fraudulent misrepresentation claim was "wholly dependent on the CMC Contract, under which EDCare had the right to collect fees from CMC for services provided by GSCEP."  *Id.* at 452.

The posture of this case is quite different from that of *EDCare*.  First, while it appears that EDCare's fraudulent misrepresentation claim could have been brought before the arbitrators who resolved GSCEP's breach of contract and tortious interference claims, in this case, the ACAB, which arbitrated the BTP-L&R fee dispute, had no jurisdiction to consider tort claims (including claims

---

[6]  And, although this was not a part of this court's rationale in *EDCare*, DeLisi's alleged statement that "there [was] absolutely no reason to have concern regarding [GSCEP's] receiving payment in full for [its] services" and his expressed "expect[ation] that the hospital would be successful in collecting the significant funds" owed to it, at least arguably were not actionable factual representations or omissions.  *Cf. Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 76 (D.D.C. 2008) (internal quotation marks, citation, and brackets in original omitted) ("It is well-established . . . that generalized statements of optimism that are not capable of objective verification are not actionable . . . .").

relating to fraudulent misrepresentation or conspiracy). Under the rules of the ACAB, that body's jurisdiction is limited to disputes "about the fee paid, charged, or claimed for legal services." D.C. Bar Att'y-Client Arb. Bd. R. 3 (b).[7] In addition, the Superior Court did not find, and none of the parties has argued that, Kalin is a privy of any of the BTP defendants such that he could be bound by the ACAB decision to which the BTP defendants were subject. For those reasons, the ACAB arbitration decision did not have *res judicata* effect as to L&R's claims sounding in fraudulent inducement and civil conspiracy[8] against the BTP defendants, and likewise is not a *res judicata* bar with respect to any claim against Kalin.[9]

---

[7] *See also* D.C. Bar R. XIII (a)–(b) (providing that "[a]n attorney subject to the disciplinary jurisdiction of this [c]ourt shall be deemed to have agreed to arbitrate disputes over fees for legal services and disbursements related thereto" "pursuant to such reasonable rules and regulations . . . as may be promulgated from time to time by the [ACAB].").

[8] "Civil conspiracy is not an independent tort but only a means for establishing vicarious liability for an underlying tort." *Grimes v. District of Columbia*, 89 A.3d 107, 115 (D.C. 2014) (internal quotation marks omitted).

[9] As we repeated in *EDCare*, "[u]nder the doctrine of *res judicata*, 'a final judgment on the merits of a claim [including an arbitration award] bars relitigation in a subsequent proceeding of the same claim [including any claim arising out of a common nucleus of facts that could have been litigated in that proceeding] between the same parties or their privies.'" 50 A.3d at 451 (quoting *Patton v. Klein*, 746 A.2d 866, 869 (D.C. 1999)).

(continued…)

Second, as already discussed, while this court's opinion in *EDCare* focuses on EDCare's complaint about misleading statements made by DeLisi during the contract period in an email sent two days before the agreed contract-termination date, L&R complains of alleged misrepresentations and omissions that preceded and induced decisions by the law firm not to withdraw from the representation of BTP in an open-ended engagement,[10] and to continue work under a modified engagement letter.

---

(…continued)

The parties disagree about whether, and to what extent, the Superior Court dismissed counts Count IV and V of the complaint on the ground of *res judicata*. In any event, no one appears to argue that the court's dismissal of those claims can be sustained on the basis of *res judicata*.

[10] This case is similar to *Mendelsohn, Drucker & Assocs. v. Titan Atlas Mfg.*, 885 F. Supp. 2d 767 (E.D. Pa. 2012). In that case, a client that had failed to make timely payment for a law firm's legal services sent an email to the law firm giving a purported U.S. Postal Service Priority Mail tracking number for a payment the client claimed to have sent, causing the law firm not to withdraw from representation but to prepare and file an Answer on the client's behalf. *Id.* at 772. After the Postal Service reported that "the provided tracking number did not match any envelope sent," *id.,* and a promised "replacement check" did not arrive, the law firm withdrew and sued the client for fraudulent inducement and breach of contract. *Id.* The court denied the client's motion to dismiss the fraudulent-inducement claim, rejecting the client's argument that the "gist of the action" was a contract claim and reasoning that the client "knowingly induced [the law firm] to continue its legal representation through fraudulent misrepresentations about [the client's] forthcoming payment of legal fees" and that the fraudulent inducement was "collateral to [the client's] contract with [the law firm] because it constitutes a

(continued…)

Third, EDCare sought to recover its "out-of-pocket" outlays incurred in performing its obligations as the assignee of GSCEP's contract rights and obligations under the contract with CMC, i.e., the "additional resources and funds [EDCare devoted] towards the provision of emergency medicine management services for the Hospital" through the agreed contract termination date. *Id*. at 452. In other words, EDCare sought to recover reliance damages, which we said "could have been addressed in an action for breach of contract." *Id.*; *see* 3 Dan B. Dobbs, *Law of Remedies* § 12.1 (1) (2d ed. 1993) (describing reliance damages as a contract remedy).

By contrast, L&R, through Counts IV and V of its complaint, seeks recovery of items of damages that do not "fall within the realm of recoverable contract damages" and are not "potentially compensable under contract principles." *Choharis*, 961 A.2d at 1089–90. Most obviously, L&R seeks recovery of what the complaint terms its "attorneys' fees" incurred in pursuing recovery against the BTP defendants and Kalin for damages from their alleged fraud and conspiracy. Elsewhere, L&R has described this item of prayed-for damages as "compensat[ion]

_____

(…continued)
breach of duties of honesty imposed by society, not contractual duties contained in the Engagement Letter." *Id.* at 790.

for the need to pursue" and "chase" the BTP defendants "to honor [their] obligation" given their "obstructive conduct," including, as L&R contended at oral argument, its costs of "prosecut[ing] [its claims] before the ACAB."[11]

"In line with the 'American rule' for litigation generally, the parties in contract litigation pay their own attorneys' fees . . . unless the contract itself provides otherwise . . . ." 3 Dobbs, *supra*, § 12.1 (1). "[I]n tort actions for fraud or fraudulent inducement," however, our jurisdiction recognizes the principle that "the perpetrator of a fraud is liable to respond in such damages as naturally and proximately resulted from the fraud, and the proximate result rule should be employed in a flexible manner." *Espaillat v. Berlitz Schs. of Languages of Am., Inc.*, 383 F.2d 220, 222 (D.C. Cir. 1967) (internal quotation marks omitted). Under that flexible approach, if L&R is able to prove fraudulent inducement by the BTP defendants and/or Kalin and the expenses it has incurred in pursuing its claims for

---

[11] The Superior Court seemed to believe that the arbitration award of (a portion of) the fees L&R billed to BTP for legal services was "the exact same relief" L&R sought through its Count IV and Count V prayer for "attorney's fees." However, the fees at issue here are not the fees L&R billed for legal services provided to BTP, but instead are L&R's costs of representing itself in pursuing its claims against the appellees. BTP, which argues that "L&R fails to identify what exactly it retained or gave up as a consequence of BTP's alleged fraudulent misrepresentations over and above the disappointment of not getting paid by BTP," appears also to have overlooked L&R's claim for its "attorney's fees" in representing itself as an item of compensatory damages.

payment under the contract against the BTP defendants, it may be entitled to recover those expenses as an item of compensatory damages (for which the perpetrators of the fraud would be jointly and severally liable). *Cf. Hundley v. Johnston*, 18 A.3d 802, 809 (D.C. 2011) (holding that where attorneys' fees are in essence compensatory damages for a tort, they may be allowed).

In seeking "its reasonable attorney's fees incurred in having to bring this suit as an additional item of damage," L&R also relies on cases applying the "almost universally recognized rule that [counsel fees] may be recovered in . . . cases where the wrongful action complained of is characterized by . . . gross fraud on the part of the defendant." *Schlein v. Smith*, 160 F.2d 22, 25 (D.C. Cir. 1947) (quoting *Ballard v. Spruill*, 74 F.2d 464, 466 (D.C. Cir. 1934)). We express no opinion as to whether the factual allegations in this case, if proven, satisfy that standard. We do hold that L&R was entitled to attempt to prove its entitlement to such damages for the alleged fraud.

L&R also told the Superior Court that, through Counts IV and V of the complaint, it seeks "damages . . . up to the claimed 1.8 million dollars" or, as described in the complaint, "damages in the amount of services rendered and billed, but not paid, with interest from when payment was due." It is not clear to

us that L&R is still pursuing this item of claimed damages, because its briefs on appeal do not specifically argue for it. We nevertheless address this item because it might be thought that its inclusion in L&R's prayer for relief under Counts IV and V shows that these counts seek damages that *are* compensable under contract principles. That is, it might be thought that to the extent this item of damages forms the basis of L&R's prayer for relief under Counts IV and V, both counts are barred under the *Choharis* rule, which bars a parallel tort claim unless "an action for breach of contract would reach *none* of the damages suffered by the tort." 961 A.2d at 1089 (emphasis added). Indeed, counsel for the BTP defendants and counsel for Kalin both contended at oral argument that L&R's prayer for the $1.78 million in damages under Counts I–III *and* under the fraud and conspiracy counts shows that the fraud and conspiracy counts are not separate and independent of the contract claim.[12]

We have said that "[b]y suing in tort, the defrauded party . . . claims sufficient compensation to make his position as good as it would have been had he not entered into the transaction at all." *United Sec. Corp. v. Franklin*, 180 A.2d

---

[12] BTP also makes the point somewhat differently, arguing that "the arbitration award . . . bars L&R from coming back and arguing that absent BTP's alleged fraud, they should have or would have gotten more in attorney's fees from BTP under the engagement letters."

505, 510 (D.C. 1962) (internal quotation marks and citation omitted).  Under a different formulation, the measure of damages is "what the [defrauded party] lost as a result of the fraud." *Espaillat*, 383 F.2d at 223.  The *Espaillat* decision is particularly instructive as to the measure of damages when the "fraudulently induced contract [was] for personal services." *Id.* at 222.  The case involved a fraudulent-inducement claim by a foreign national who alleged that she took a job with the Berlitz language school at a promised salary of $600 a month for one year on the basis of the school's knowingly false representation that her status as an alien would not interfere with the proposed employment. *Id.* at 221.  "[T]wo months later Army authorities . . . required Berlitz to discharge her because it had been learned that she was an alien." *Id.*  In remanding the matter for a new trial on the issue of damages, the D.C. Circuit stated that the new jury should be instructed that it could take into account the plaintiff's "earning power in various capacities reasonably related to the nature of the services the appellee intended she should render over the contemplated life of the contract." *Id.* at 224.  Further, the D.C Circuit said, jurors should be instructed that while their determination would "not necessarily be based upon the amount of the promised salary," the jurors "w[ould] be free to consider as some evidence" the monthly amount the parties themselves had agreed the appellant was to receive under the employment contract. *Id.* at 224.  In other words, as we read *Espaillat*, the jury could consider the amount the

plaintiff was to have been paid under the contract as a measure of her damages for fraudulent inducement, with a view toward putting her in the position she would have been in had she not entered into the fraudulently induced contract but pursued other earnings opportunities instead.

In this case, the amount L&R billed BTP for legal services under the second modified engagement letter is some measure of what the law firm could have earned if the lawyers involved had withdrawn from representing BTP and taken on work for another or other clients. As L&R has suggested, its damages (if any) in this regard were likely "up to" rather than equivalent to the billed $1.8 million, because that amount was billed for what L&R has asserted was "round-the-clock work" and also because it included a success fee ($358,659.96) that the law firm would not necessarily have earned through other engagements, as well as expenses ($196,605.67, for, *inter alia*, "depositions and interviews across the country and overseas") the law firm would not necessarily have incurred in representing other clients. Whatever L&R might be able to prove in the way of "damages . . . up to the claimed 1.8 million dollars," the point we make here is that L&R's inclusion of a prayer to recover such an amount as damages for alleged fraudulent inducement does not necessarily require a conclusion that the law firm is attempting to recharacterize a contract claim as a fraud claim, or is merely trying to obtain the

benefit of its bargain under its contract with BTP.[13]  Though monetarily equivalent to L&R's claimed damages for breach of contract, the law firm's prayer in Counts IV and V for approximately $1.8 million in damages may have a different basis and may pertain to damages that are not compensable under contract principles.[14]

---

[13]  More generally, the fact that a party relies on what was required under a contract to prove its alleged damages for a defendant's failure to disclose material information does not necessarily mean that the party is improperly trying to enforce the contract.  For instance, in *Campbell v. Fort Lincoln New Town Corp*., 55 A.3d 379 (D.C. 2012), we determined that the plaintiffs, who were neither parties to nor third-party beneficiaries of a land disposition agreement ("LDA") between the District of Columbia and a developer, were not entitled to sue for the developer's breach of the LDA.  *Id.* at 382–83.  We held, however, that the plaintiffs were entitled to present evidence of the developer's breach of the LDA in order to prove the existence and extent of their damages under their cause of action for the developer's alleged violation of the disclosure-to-prospective-purchasers provisions of the District of Columbia Condominium Act.  *Id*. at 386.  While acknowledging our statement in *Choharis* that "a tort claim may be considered independent of a claim for breach of contract if, *inter alia*, the duty upon which the tort is based flows from considerations other than the contractual relationship," *id*. at 386 n.26, we reasoned that the plaintiffs' "need to present evidence of [the developer's failure to perform its obligations under] the LDA . . . to prove their damages did not render their Condominium Act claim a mere reformulation of their legally flawed breach of contract claim."  *Id*. at 386.  We said that it was not correct "to equate [the plaintiffs'] theory of damages with enforcement of the LDA."  *Id*. at 387.  We concluded that "if the[] [plaintiffs] succeed in proving that, had the LDA been disclosed to them, they would have convinced the District to enforce it against [the developer], they at most will be entitled to monetary damages reflecting the lost value of [the developer's] performance to them."  *Id*.

[14]  *Compare* 3 Dobbs, *supra*, §§ 12.1 (1), 12.3 (1) (explaining that courts usually do not consider lost-opportunity costs to be contract-reliance expenses and that such costs are "special damages and subject to the limit[ing rules] that apply to such claims," including certainty and foreseeability), *with* 2 Dobbs, *supra*, § 9.2 (3)

(continued…)

At the very least, the Superior Court should not have dismissed Counts IV and V in their entirety without affording the parties an opportunity for briefing on the rationale for the damages that L&R is seeking, which could be independent of the law firm's contract claims and thus recoverable notwithstanding *Choharis* and *EDCare*. Of course, in no event will L&R be permitted a duplicative recovery. *See Saunders v. Hudgens*, No. 12-CV-1318, 2018 D.C. App. LEXIS 194, at *9 (D.C. May 10, 2018) ("A plaintiff is entitled to be made whole, but not more than whole."); *Espaillat*, 383 F.2d at 224 ("[T]he jury must be told to deduct [from the appellant's damages] the compensation [already] received from the appellee by the appellant . . . .").

## IV. Conclusion

We conclude for the foregoing reasons that L&R's claims for fraud and conspiracy were erroneously dismissed. Accordingly, the judgment of the trial court is reversed and the case remanded for further proceedings consistent with this opinion.

*So ordered.*

---

(…continued)
("In most jurisdictions, the victim of fraud may recover special or consequential damages caused by the misrepresentation . . . .").