*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## Nos. 21-CV-122 & 22-CV-58

JONATHAN HAWKES RAYNER, APPELLANT,

V.

YALE STEAM LAUNDRY CONDOMINIUM ASSOCIATION, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(2020-CA-004077-R(RP))

(Hon. Hiram E. Puig-Lugo, Trial Judge)

(Submitted November 8, 2022    Decided February 16, 2023)

*Jonathan Hawkes Rayner*, pro se.

*Laura M.K. Hassler* was on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, ALIKHAN, *Associate Judge*, and FERREN, *Senior Judge*.

FERREN, *Senior Judge*: For conduct involving his dogs, Jonathan Hawkes Rayner was disciplined by the Yale Steam Laundry Condominium Association ("the Association") where he lived. Rayner sued the Association, alleging that the disciplinary proceedings failed to comply with the Association's Enforcement Procedures in its bylaws ("Enforcement Procedures"). The trial court (1)

dismissed Rayner's case pursuant to Super. Ct. Civ. R. 12(b)(6)[1] for failure to state a claim; (2) denied him leave to amend his complaint; and then (3) denied his motion to vacate the dismissal and reinstate his complaint under Super. Ct. Civ. R. 60(b).[2] Rayner appeals the judgment by challenging all three rulings. We affirm.

## I. Background

Rayner is a member of his building's condominium association. He lives with two dogs, an older, male German Shepherd mix ("Dog 1") and a younger, female German Shepherd mix ("Dog 2"). On December 26, 2019, Rayner and his leashed dogs left his apartment and entered a shared hallway where his neighbor, Timothy O'Connor, stood nearby. The dogs briefly barked at O'Connor as Rayner walked them down the hallway toward him. Dog 2 then "jumped up at Mr. O'Connor" and tore his suit jacket. Rayner immediately offered to pay O'Connor to replace the jacket, and O'Connor accepted.

---

[1] Super. Ct. Civ. R. 12(b)(6) provides that "a party may assert the following defenses by motion . . . failure to state a claim upon which relief can be granted."

[2] Super. Ct. Civ. R. 60(b) gives the trial court discretion "[o]n motion and just terms . . . [to] relieve a party or its legal representative from a final judgment, order, or proceeding for" several enumerated reasons.

The next day, O'Connor submitted a complaint to the community building manager about the incident with Rayner's dogs. The building manager, in turn, emailed Rayner, asking him to "kindly and quickly move [Rayner's] dogs from [O'Connor's] presence" when the dogs and O'Connor "are in the same immediate area." On December 31, Rayner sent the Association a statement about the December 26 incident.

A few weeks later, Rayner received notice that the D.C. Animal Care and Control Agency ("Animal Control") was investigating the December 26 incident. He then received written notice ("First Hearing Notice") from the Association that a hearing on the December 26 incident would occur on February 4, 2020 ("First Hearing"). This notice did not include a copy of O'Connor's complaint.

A second incident occurred on January 24, 2020, before the First Hearing. This time, Rayner was entering his front door when Dog 2—unleashed—passed by him, entered the hallway, and "ran towards Mr. O'Connor." The dog stopped short of O'Connor after Rayner commanded her to return and she obeyed. O'Connor submitted a complaint to the Association the same day. The Association emailed Rayner on January 27, 2020, referencing the January 24 incident and reminding him "to keep your pets on a leash when in the common areas of the building."

Rayner emailed the Association that same day, explaining that he could not attend the First Hearing due to a death in his family.

No hearing occurred on February 4, and on February 5, Rayner sought to stay the First Hearing until Animal Control completed a District of Columbia Freedom of Information Act ("FOIA") request[3] regarding the December 26 incident. Rayner also sought clarification from the Association about "why any community proceeding is necessary." The Association responded by explaining its "fiduciary responsibility to the community . . . to determine whether there has been a violation of bylaws" and assured Rayner that a hearing "gives you due process rights to try to explain why there was no violation." Then on February 7, the Association sent Rayner notice that his hearing would be on February 18.

On the morning of February 18, Rayner emailed the Association alleging procedural defects in the notice he received for the hearing. He also asked the Association to delay his hearing pending a response to his FOIA request to Animal Control. The First Hearing occurred, however, on February 18, and Rayner did not attend. The Association issued its hearing decision on March 3 ("First Hearing

---

[3] *See* D.C. Code § 2-532(a) ("Any person has a right to inspect, and at his or her discretion, to copy any public record of a public body . . . .").

Decision"). This decision fined Rayner $100 for the January 24 incident, declared his dogs a nuisance, and called for their removal from the condominium. However, the decision stayed the dogs' removal as long as they wore muzzles in common areas.

Later in March, Rayner sent the Association a settlement offer which the Association declined. On March 31, Rayner received a response to his FOIA request from Animal Control. The response noted that "there was no bite wound" and that Animal Control "found no basis to declare [Rayner's] dogs dangerous or potentially dangerous."

After receiving the FOIA response, Rayner proffered further settlements with the Association in April and May, which the Association declined. In early July, the Association sent Rayner written notice ("Second Hearing Notice") of a second hearing about the December 26 and January 24 incidents, to be held on August 4, 2020. This notice listed removal of one or both dogs as a possible sanction; included O'Connor's complaints from both incidents; and explained that the hearing would address the incidents, including Rayner's "ability/efforts to properly keep your dogs under control generally," whether the dogs "constitute

'orderly domestic pets'" under the Association's bylaws, and whether the dogs "constitute a nuisance" under those bylaws and other relevant rules.

On July 21, 2020, Rayner asked the Association to continue the Second Hearing, citing alleged violations of the Enforcement Procedures.[4] The Association rescheduled the Second Hearing for September 15, 2020 and provided Rayner with notice of this new date on September 1. Rayner contends that, before the Association chose September 15, he told the Association that he would be busy on September 15. On September 10, Rayner asked the Association to delay the Second Hearing for "good cause," but the Association declined.

The Second Hearing proceeded on September 15 and Rayner did not attend. On September 21, Rayner filed a complaint against the Association in Superior Court. Nine days later, on September 30, the Association issued its hearing decision to Rayner ("Second Hearing Decision"). This decision explained how the Association "agreed to re-start the process" after the first hearing, stressing that this second decision "entirely supersedes, replaces, and overrides the decision issued on March 3, 2020." The Association fined Rayner $500 per dog for the

---

[4] Rayner also sought from the Association several segments of surveillance footage of his dogs around this time. The Association provided some of these videos within the constraints of its recording and record-keeping technology.

December 26 incident and $100 total for the January 24 incident, for a sum of $1,100 in fines, and required him to provide proof of Dog 1's rabies vaccination and both dogs' licensing.[5]  Further, the decision "implore[d]" Rayner to follow Animal Control's recommendations of muzzling the dogs in common areas, communicating with passersby about the dogs, and preventing the dogs from jumping on people.  The decision, however, neither declared the dogs a nuisance nor ordered their removal.

Rayner filed an Amended Complaint on October 13, 2020, alleging six counts.  Count I sought injunctions against the Association, claiming that it failed to "ma[k]e a prudent and reasonable attempt to ensure due process according to the . . . Enforcement Procedure."  Count II alleged breach of contract based on how the Association implemented the Enforcement Procedures.  Counts III and IV alleged the Association committed the torts of negligence and breach of its fiduciary duty by breaching its duties to Rayner.  Count V sought damages for "pain and suffering."  Count VI alleged retaliatory action, pointing to the fines levied against Rayner.

---

[5] The Second Hearing Decision referred to Rayner's male dog as "Dog 2" and his female dog as "Dog 1."  To avoid confusion, we follow the complaint's naming convention and call Rayner's male dog, "Dog 1" and his female dog, "Dog 2."

In response, the Association filed a motion to dismiss under Super. Ct. Civ. R. 12(b)(6). Rayner filed an opposition to the motion and sought leave to amend Counts I and V (seeking injunctions and damages), amend Count III (negligence) "into" his breach of contract claim, and amend Count VI (retaliatory action) to clarify its statutory basis in D.C. Code § 42-1903.08(a)(11).[6] The trial court granted the Association's Rule 12(b)(6) motion and declined to grant Rayner leave to amend his complaint.

In dismissing the breach of contract claim, the court began with the Association's preliminary investigation into the incidents with Rayner's dogs. The order noted that the Enforcement Procedures do not require the Association "to undertake specific efforts during a preliminary investigation," but that, in any event, the Association had received statements from Rayner and O'Connor during this investigation.

---

[6] D.C. Code § 42-1903.08(a)(11) provides that a condominium unit owners' association "shall have the . . . [p]ower to . . . after notice and an opportunity to be heard, levy a reasonable fine for violation of the condominium instruments or rules and regulations of the unit owners' association."

As for the Association's adherence to the Enforcement Procedures more generally, the court explained that the Enforcement Procedures "provide [the Association] latitude to carry out its duties" as long as the Association provides due process. Accordingly, the court reasoned, Rayner could not sustain a breach of contract claim without "alleg[ing] facts establishing he was not afforded due process"—facts he did not establish here, said the court, because to the contrary (reflecting due process) he submitted a statement about the incident, received prior notice of both hearings and of their rescheduling at his request, received video footage to aid in his case, "and was notified of his right to be present and participate at both hearings." Further, explained the court, the Association restarted the disciplinary process with its Second Hearing Notice, which "cured any alleged deficiencies" in due process in the first hearing.

The court then dismissed Rayner's tort claims of negligence and breach of fiduciary duty because these claims did not exist independent of Rayner's and the Association's contractual relationship and thus could not be sustained given the "independent tort doctrine."[7] The court then dismissed Rayner's retaliation claim

---

[7] *See Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008) (explaining that for a tort claim to coexist with a contract claim, "the tort must exist in its own right independent of the contract, and any duty upon which

because retaliation is a statutory claim whereas Rayner's claim lacked a statutory foundation. With only Rayner's claims for injunctive relief and pain and suffering remaining, the court recognized that these claims "are not standalone causes of action" and thus could not be granted because Rayner's other causes of action were dismissed.

Finally, the court declined to grant Rayner leave to amend his complaint. The court recognized that Rayner already had amended his complaint once and concluded that in any event his requested amendments would be futile. The court explained that the requested amendments to the injunctive and pain and suffering claims would not convert those remedies into a cause of action. More specifically, incorporating the negligence claim into the breach of contract claim would not add any new facts or arguments to the dismissed breach of contract claim. Finally, concluded the court, "no amendment or clarification will cure the lack of authority in District of Columbia law for a cause of action for retaliation."

Rayner appealed both the dismissal and the denial of leave to amend on February 20, 2021. Nearly one year later, in January 2022, Rayner filed a motion

the tort is based must flow from considerations other than the contractual relationship").

to vacate the order of dismissal and reinstate his case under Rule 60(b). The trial court denied this motion with an order explaining that the Rule 60(b)(2) remedy concerning "newly discovered evidence" is "expressly limited to cases that proceeded to trial."[8] Further, the court noted, for the sake of argument that it did "not find that Plaintiff's proffered factual amendments would have produced a different result if presented before this Court granted Defendant's motion to dismiss. Thus, providing Plaintiff a *third* opportunity to amend his complaint would be futile." Rayner timely appealed this denial and his appeals were consolidated.

## II. Analysis[9]

---

[8] *See* Super. Ct. Civ. R. 60(b)(2) (allowing a court to relieve a party from a final judgment for "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to *move for a new trial* under Rule 59(b)" (emphasis added)).

[9] As a preliminary matter, on November 3, 2022, Rayner filed a motion in this court under D.C. App. R. 10(e)(3) seeking to supplement the record with a new exhibit and additional facts. The Association opposed this motion and Rayner filed a reply to the Association's opposition. Supplementing the record would require further findings of fact, which is the function of the trial court, not this court. *See Lihlakha v. United States*, 89 A.3d 479, 490 (D.C. 2014) ("As an appellate court, we do not make findings of fact and therefore may not rule on our own reading of the evidence unaided by the trial court's findings . . . ."). Accordingly, we deny Rayner's motion to supplement the record and rely only on those facts that were presented to the trial court, whose decisions we review on appeal.

On the record here, Rayner challenges (1) the dismissal of his case under Rule 12(b)(6), (2) the trial court's decision to deny him leave to amend his complaint, and (3) the trial court's denial of his Rule 60(b) motion to vacate the dismissal. We address these arguments in turn and affirm the trial court's rulings.

### A. Motion to Dismiss

Rayner argues that the trial court erred in dismissing his claims against the Association for failure to state a claim for which relief can be granted. We review the dismissal of claims under Rule 12(b)(6) de novo.[10] On appeal, "we accept the allegations of the complaint as true, and construe all facts and inferences in favor of the plaintiff."[11] Our review of "a Rule 12(b)(6) motion may not rely on any facts that do not appear on the face of the complaint itself."[12] To survive a

---

[10] *Grayson v. AT & T Corp.*, 15 A.3d 219, 228 (D.C. 2011) (en banc).

[11] *Solers, Inc. v. Doe*, 977 A.2d 941, 947 (D.C. 2009) (quoting *In re Est. of Curseen*, 890 A.2d 191, 193 (D.C. 2006)).

[12] *Kitt v. Pathmakers, Inc.*, 672 A.2d 76, 79 (D.C. 1996) (quoting *Am. Ins. Co. v. Smith*, 472 A.2d 872, 873-74 (D.C. 1984)); *see Wetzel v. Cap. City Real Est., LLC*, 73 A.3d 1000, 1006 n.5 (D.C. 2013) ("In ruling on a Rule 12(b)(6) motion to dismiss, the court may consider only 'documents incorporated into the complaint,' such as . . . [documents] that were attached to appellants' complaint."

12(b)(6) motion, a complaint must "contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"[13] Thus, a complaint that "fails to allege the elements of a legally viable claim" will not survive.[14] We first assess Rayner's breach of contract claim, and then turn to his tort claims of negligence and breach of fiduciary duty, his retaliation claim, and his claims for injunctive relief and damages for pain and suffering.

## 1. Breach of Contract

Rayner's breach of contract claim relies on at least eight provisions in the condominium Enforcement Procedures, but two other provisions swayed the trial court's analysis. The first provision the trial court relied on, Section II.B, specifies that "[t]he Board[15] may determine the specific manner in which the provisions of

---

(quoting *Washkoviak v. Student Loan Marketing Ass'n*, 900 A.2d 168, 178 (D.C. 2006)).

[13] *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 543 (D.C. 2011) (quoting Super. Ct. Civ. R. 8(a)).

[14] *Chamberlain v. Am. Honda Fin. Corp.*, 931 A.2d 1018, 1023 (D.C. 2007).

[15] The Association has a Board of Directors ("the Board") that acts on the Association's behalf. For consistency, we use the party name, "the Association," to refer to both the Board and the Association.

this Resolution[16] are to be implemented, provided that reasonable due process is afforded."[17] The second, Section II.C, provides that "[a]ny inadvertent omission or failure to conduct any proceeding in exact conformity with this Resolution shall not invalidate the results of such proceeding, so long as a prudent and reasonable attempt has been made to ensure due process according to the general steps set forth in this resolution."[18] We agree with the trial court that these provisions gave the Association sufficient latitude to survive Rayner's breach of contract claims, provided that the Association afforded Rayner due process. And we agree that Rayner received the process he was due.

The core of the alleged breaches concerns the Association's failure to follow the Enforcement Procedures to a tee. For example, Section I.C.1 states that, when planning a hearing, the Association "shall serve a Notice of Hearing and a copy of

---

[16] The Association adopted its Enforcement Procedures via a "Special Resolution" pursuant to its powers under Article IV, Section 4.1 of the Association's bylaws. Accordingly, the Enforcement Procedures document refers to itself as "this Resolution." We refer to this document as the Enforcement Procedures for internal consistency.

[17] SA313-17 ("Enforcement Procedures") § II.B.

[18] Enforcement Procedures § II.C. Section II.A is also relevant: "This Resolution is intended to serve as a protection to owners and residents to ensure that their rights are protected and to *serve as a guideline* for the Board as it carries out its duties to enforce the Governing Documents." Enforcement Procedures § II.A (emphasis added).

the complaint on the respondent."[19] In Rayner's case, the First Hearing Notice did not contain a copy of the complaint, although the Second Hearing Notice did contain copies of the complaints for both the December 26 and January 24 incidents. Admittedly, therefore, Rayner's complaint is correct in alleging that the Association's actions (including, for example, the failure to include the complaint with the First Hearing Notice) did not perfectly mirror the Enforcement Procedures. That said, however, those Procedures explain that "failure[s] to conduct [the] proceeding in exact conformity with this Resolution shall not invalidate the results of such proceeding" if the Association made "prudent and reasonable attempt[s] . . . to ensure due process according to the general steps set forth in this resolution."[20] Here, no breach of contract occurred because, as elaborated below, the Association ensured the due process essentials required under the Enforcement Procedures.

Due process in this context—not a constitutional matter—does not require perfect adherence to the Enforcement Procedures. After all, these procedures recognize that a "prudent and reasonable attempt [can] be[] made to ensure due

---

[19] Enforcement Procedures § I.C.1; *see* Am. Compl. ¶ 87.

[20] Enforcement Procedures § II.C.

process" even in the face of "[a]ny inadvertent omission or failure to conduct any proceeding in exact conformity with" the Enforcement Procedures.[21]

Here, the Association made multiple prudent and reasonable attempts to ensure the process required. As the trial court recognized, Rayner's complaint established that he (1) had the opportunity to and did submit a statement about the incident, (2) received prior notice of both hearings, (3) received notice of when the hearings were rescheduled at his request, (4) requested and received video footage to aid in his case, and (5) was notified of his right to be present and participate at both hearings.[22] Moreover, the Association's decision to issue the Second Hearing Notice, hold the Second Hearing, and issue the Second Hearing Decision specifically remedied many of the procedural issues that Rayner flagged, such as the missing complaint in the First Hearing Notice.

Rayner contends that he was denied due process in the Second Hearing because the Association used "the improperly held first hearing as the basis for new sanctions." This argument overlooks the Second Hearing Decision's explanation that "this decision . . . entirely supersedes, replaces, and overrides" the

---

[21] Enforcement Procedures § II.C.

[22] 1/21/2021 Order at 8-9.

First Hearing Decision.[23] Moreover, the alleged due process denial presupposes bias from the fact that Rayner's upstairs neighbor was President of the Association during the preliminary investigation, allegedly creating a conflict of interest. But the amended complaint provided no basis to conclude that the President of the Association was biased against Rayner; it only stated that the President "resides in the unit directly above" Rayner's.[24] And, to the extent Rayner argues that the Association should have opened a new investigation before the Second Hearing, the trial court order correctly observed that the Enforcement Procedures do not require the Association "to undertake specific efforts during a preliminary investigation."[25] In other words, the Association had discretion in conducting preliminary investigations and acted within its discretion.

Rayner also posits that the Association deprived him of due process because, after he asked the Association to reschedule the Second Hearing, the Association chose a date on which he established he was unavailable. When he asked for the

---

[23] Second Hearing Decision at 2.

[24] Our review of a 12(b)(6) ruling is limited to "documents incorporated into the complaint" such as those "that were attached to appellants' complaint." *Wetzel*, 73 A.3d at 1006 n.5 (quoting *Washkoviak*, 900 A.2d at 178). Thus, Rayner's discussion in his briefs about his relationship with the President of the Association plays no role in our analysis.

[25] 1/21/2021 Order at 8.

hearing to be rescheduled again, the Association declined. Even so, the Association twice rescheduled hearings on Rayner's request. Furthermore, the Enforcement Procedures specify that "management *may* reset the time and date of [a] hearing" if a party shows good cause for non-attendance and provides alternative hearing times and dates.[26] Thus, the Enforcement Procedures do not *require* the Association to reschedule hearings. As such, the Association's decision not to reschedule Rayner's Second Hearing a second time did not deprive him of due process.

Finally, Rayner argues that he was denied due process because the Association did not let him, at the Second Hearing, present in-person evidence of his dogs' behavior. The Enforcement Procedures provide that the Association "may determine the manner in which the hearing will be conducted, so long as the rights set forth in this section are protected."[27] They go on to say that, "[g]enerally, any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely."[28] The Association thus had discretion in admitting evidence, both "[g]enerally" and in specific cases. Here,

---

[26] Enforcement Procedures § I.C.2 (emphasis added).

[27] Enforcement Procedures § I.D.3.a.

[28] Enforcement Procedures § I.D.3.a.

the Association admitted video evidence of Rayner's dogs' behavior, instead of an in-person demonstration. As Rayner's amended complaint confirms, this evidence allowed him to demonstrate "Dog 1's obedient behavior within his unit, including his ability to discriminate between true and false commands, and Dog 2's proclivity to use her paws to manipulate objects." This decision about how to present evidence at the hearing fell within the Association's authority under Enforcement Procedures Section I.D.3.a and protected Rayner's right to present evidence on his behalf.

In sum, the trial court did not err in dismissing Rayner's breach of contract claim. The Enforcement Procedures gave the Association flexibility in how it implemented the procedures. We cannot say that the way the Association implemented these procedures denied Rayner due process. Accordingly, no breach of contract occurred.

## 2. Negligence and Breach of Fiduciary Duty

The trial court correctly concluded that Rayner's tort claims for negligence and breach of fiduciary duty cannot survive because they do not arise independent of the parties' contractual relationship. When a complaint includes a breach of

contract claim and a tort claim, "the tort must exist in its own right independent of the contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship."[29]  As such, "[t]he tort must stand as a tort even if the contractual relationship did not exist."[30]

Here, the negligence claim would not stand without the contractual relationship.  In trying to establish the "duty" element of negligence, the complaint states that the Association "has a duty to exercise reasonable care in implementing the Enforcement Procedure in order to protect Association members such as Plaintiff and his property."  This duty stems directly from the contractual relationship and therefore cannot stand.[31]  The breach of fiduciary duty claim

---

[29] *Choharis*, 961 A.2d at 1089.

[30] *Id.*

[31] In his briefs to this court, Rayner argues for the first time that the Association's actions vis-à-vis the Animal Control investigation "f[e]ll under a general duty for reasonable care," and thus fell outside the parties' contractual relationship.  We decline to address this argument because arguments not raised in the trial court "are normally spurned on appeal."  *Crockett v. Deutsche Bank Nat'l Tr.*, 16 A.3d 949, 953 (D.C. 2011).

suffers from the same defect, as it relies solely on the contractual relationship between the Association and Rayner.[32]

### 3. Retaliation

Rayner's complaint argues that the Association's imposing a fine on him constituted "retaliatory action." The trial court correctly dismissed Rayner's retaliation claim as lacking a statutory basis. Even construing Rayner's attack on the fine as being "unreasonable," rather than retaliatory, we come to the same conclusion.

Retaliation is a statutory, not a common-law, cause of action.[33] The statute that Rayner relied on in his opposition to the motion to dismiss does not create a

---

[32] *See* Am. Compl. ¶¶ 284-85 ("The Board of Directors has a fiduciary duty to the Association, and to the Plaintiff specifically as a member of the Association. . . . By failing to correct known problems with the implementation of the Enforcement Procedure affecting Plaintiff and with the safety and security of the Condominium, the Board and thus the Association has breached that fiduciary duty to Plaintiff.").

[33] *See Twyman v. Johnson*, 655 A.2d 850, 858 (D.C. 1995) ("[T]here is no common law authority for a cause of action for retaliation against a landlord."); *see also Bereston v. UHS of Del., Inc.*, 180 A.3d 95, 111 (D.C. 2018) (declining "to recognize a common-law cause of action for retaliation" in the employment context).

cause of action for retaliation. That statute, D.C. Code § 42-1903.08(a)(11), empowers condominium owners' associations "after notice and an opportunity to be heard, [to] levy a reasonable fine for violation of the condominium instruments or rules and regulations of the unit owners' association."[34] It does not empower a unit owner to sue the owners' association for retaliation outside the purview of statutes that expressly authorize causes of action for retaliation.[35] Accordingly, the trial court did not err in dismissing Rayner's retaliation claim.

On appeal, Rayner challenges the Association's fine as a breach of contract issue because the Enforcement Procedures discuss the Association issuing "reasonable fines." Rayner's complaint, however, challenged the fine only in connection with its retaliation claim, but in any event the fine was reasonable and its imposition cannot support a claim of retaliation or breach of contract. Enforcement Procedures Section III.A empowers the Association to levy

---

[34] D.C. Code § 42-1903.08(a)(11).

[35] *See, e.g.*, D.C. Code § 42-3505.02(a) ("No housing provider shall take any retaliatory action against any tenant who exercises any right conferred upon the tenant by this chapter, by any rule or order issued pursuant to this chapter, or by any other provision of law."); D.C. Code § 2-1402.61(a) ("It shall be an unlawful discriminatory practice to . . . retaliate against . . . any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under this chapter.").

"reasonable fines" as sanctions for violations of the Association's bylaws.[36] The Association's bylaws include a Pet Policy that generally prohibits animals from the condominium except for "orderly domestic pets . . . provided that their owner adheres to the following restrictions and, provided further, that the pet behaves in such a manner as not to disturb other unit owners."[37] The Pet Policy also enables the Association to request a pet's removal from the property if the pet "disturbs other residents in the building by biting, barking, crying, nipping, scratching or exhibiting otherwise unhygienic or offensive behavior."[38] Further, pets must be carried or leashed when inside the condominium while outside their owner's unit.[39]

Rayner's amended complaint establishes that Dog 2 damaged O'Connor's jacket on December 26, 2019, and ran unleashed through a common hallway toward O'Connor on January 24, 2020.

As the Second Hearing Decision explained, the December 26 incident violated the Pet Policy's provisions requiring "orderly domestic pets" and

---

[36] Enforcement Procedures § III.A.

[37] SA287-88 ("Pet Policy") § I.A.

[38] Pet Policy § I.H.

[39] Pet Policy § I.F.

prohibiting pet behavior that "disturb[s] other unit owners."[40]  The January 24 incident also violated the Pet Policy's leashing requirement.[41]  Given these violations, the Association did not act unreasonably in fining Rayner $1,100.  The Association has an interest in keeping the premises safe and discouraging behavior like the December 26 and January 24 incidents, which, as the Association explained in its motion to dismiss, "present[ed] a potential safety risk, not only to Mr. O'Connor but to other building residents."  Moreover, the fines present an issue separate from Rayner's payment to O'Connor for the damage to O'Connor's suit from Rayner's dog.[42]  We see no reason to disturb the trial court's ruling based on the Association's fines levied against Rayner.[43]

### 4.  Injunctive Relief and Pain and Suffering

---

[40] Second Hearing Decision 2-3.

[41] Second Hearing Decision 3-4.

[42] *See* Pet Policy § I.E ("Residents are liable for any . . . loss or damage caused by or arising out of the limited privilege of having a pet in the building.").

[43] Rayner's argument raised for the first time in his Supplement Brief that the fine is unreasonable because the Association allegedly inconsistently enforces its Pet Policy was not before the trial court and thus plays no role in our analysis. *See Crockett*, 16 A.3d at 953.

The trial court did not err in dismissing Rayner's Counts I and V for injunctive relief and damages for pain and suffering. These two "claims" are legal remedies, not causes of action,[44] and a court cannot grant a remedy without a cause of action.[45] Accordingly, because the trial court dismissed Rayner's causes of action (breach of contract, negligence, breach of fiduciary duty, and retaliation), it did not err in concluding that the remedies of injunctive relief and damages for pain and suffering were unavailable.

## B. Leave to Amend

Rayner next challenges the trial court's denial of leave to amend his amended complaint. He relies on Super. Ct. Civ. R. 15(a)(3), which states that "a party may amend its pleading . . . [with] the court's leave. The court should freely give leave when justice so requires."[46] Specifically, he sought three amendments:

---

[44] *See Baker v. Chrissy Condo. Ass'n*, 251 A.3d 301, 307 n.23 (D.C. 2021) (recognizing that a "count[]" for "pain and suffering" is a "remed[y], not [a] claim[]"); *Caesar v. Westchester Corp.*, 280 A.3d 176, 192 (D.C. 2022) (noting that injunctions are remedies).

[45] *Air Line Pilots Ass'n v. Twin City Fire Ins. Co.*, 803 A.2d 1001, 1005 (D.C. 2002) ("[O]nly claims or causes of action give rise to relief . . . ." (quoting *Town Crier, Inc. v. Hume*, 721 F. Supp. 99, 104 (E.D. Va. 1989)).

[46] Super. Ct. Civ. R. 15(a)(3). For the first time on appeal, Rayner argues that he was entitled to amendment as a matter of course under Super. Ct. Civ. R.

to amend Count III (negligence) "into" his breach of contract claim; to amend Count VI (retaliatory action) to clarify its statutory basis in D.C. Code § 42-1903.08 (a)(11); and to amend Counts I and V (seeking injunctions and damages). "We review a trial court's denial of a motion to amend a complaint for abuse of discretion."[47] When exercising this discretion, the trial court considers five factors: "(1) the number of requests to amend; (2) the length of time that the case has been pending; (3) the presence of bad faith or dilatory reasons for the request; (4) the merit of the proffered amended pleading; and (5) any prejudice to the non-moving party."[48] We have declined to find an abuse of discretion when a trial court "considered 'the merit of the proffered pleading' and properly concluded that appellant's proposed claim . . . did not have merit."[49]

---

15(a)(1). We do not address this argument because it was not raised below. *See Crockett*, 16 A.3d at 953.

[47] *Sibley v. St. Albans Sch.*, 134 A.3d 789, 797 (D.C. 2016).

[48] *Crowley v. N. Am. Telecomms. Ass'n*, 691 A.2d 1169, 1174 (D.C. 1997).

[49] *Sibley*, 134 A.3d at 797; *see also Choharis*, 961 A.2d at 1091-92 (affirming denial of motion to amend, in part, because the trial court considered the merits of the proposed amendments and found "[t]he proposed new contract claim was basically cumulative and the remaining amendments, sounding in tort, were variants on the tort claims upon which summary judgment had been granted").

The trial court here acted within its discretion in denying Rayner leave to amend his complaint. First, the court recognized that Rayner had previously amended his complaint.[50] Next, the court examined each of Rayner's three proposed amendments and concluded that they were futile, i.e., "that [Rayner's] proposed claim[s] . . . did not have merit."[51] After reviewing the proposed amendments that Rayner presented to the trial court, we see no basis to second guess its decision.[52] His proposed amendments fail to overcome the same hurdles that merited dismissing his claims under Rule 12(b)(6). On breach of contract, his amendments do not establish that the Association diverged so far from the Enforcement Procedures to deprive Rayner of due process. As to the alleged retaliatory action, Rayner did not identify a proper statutory basis for his claim. Moreover, his proposed amendments could not provide an independent basis for Rayner's requested injunctive relief and damages. In sum, we have no basis to

---

[50] *See* 1/21/21 Order at 12.

[51] *Sibley*, 134 A.3d at 797.

[52] Rayner's brief to this court also included several proposed "Counts" and claims that he did not raise before the trial court. We do not analyze these new claims because "[q]uestions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal." *Comford v. United States*, 947 A.2d 1181, 1186 (D.C. 2008) (alteration in original) (quoting *Miller v. Avirom*, 384 F.2d 319, 321-22 (D.C. Cir. 1967)).

believe the trial court erred in its futility analysis, and we perceive no abuse of discretion in the court's denying Rayner leave to amend his complaint.

## C.  Rule 60(b)

Rayner also appeals the trial court's denial of his motion to vacate the order of dismissal and reinstate his case under Rule 60(b).  His motion argued first that newly discovered evidence purportedly established his claims, and second that the trial court should grant him leave to amend his complaint because of his excusable neglect in drafting his amended complaint.  Although the motion did not cite specific provisions of Rule 60(b), we note that his arguments about newly discovered evidence fall under 60(b)(2) and those on excusable neglect fall under Rule 60(b)(1).[53]

---

[53] *See* Super. Ct. Civ. R. 60(b)(2) ("[T]he court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b) . . . ."); *id.* 60(b)(1) ("[T]he court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . mistake, inadvertence, surprise, or excusable neglect . . . ."); *see also Chatman v. Lawlor*, 831 A.2d 395, 404 (D.C. 2003) ("[A]rguments under each component of Rule 60(b) are separate and not interchangeable.").

On appeal, Rayner also argues that relief was justified under Rules 60(b)(3) ("fraud (whether previously called intrinsic or extrinsic), misrepresentation, or

The trial court denied this motion. First, it reasoned that because Rule 60(b)(2) concerns newly discovered evidence that "could not have been discovered in time to *move for a new trial*,"[54] and because no trial occurred here, Rule 60(b)(2) could not apply to Rayner because he could not move for a *new* trial before *any* trial occurred.[55] The court then concluded that, in any event, Rayner's "proffered factual amendments" would not have changed the court's analysis had they been before the court when it granted the motion to dismiss.[56] Thus, the trial court concluded that "providing [Rayner] a *third* opportunity to amend his complaint would be futile."[57]

---

misconduct by an opposing party") and 60(b)(6) ("any other reason that justifies relief"). We decline to address these arguments because "[o]rdinarily, arguments not made in the trial court are deemed waived on appeal." *Hollins v. Fed. Nat'l Mortg. Ass'n*, 760 A.2d 563, 572 (D.C. 2000).

[54] Super. Ct. Civ. R. 60(b)(2) (emphasis added).

[55] 1/31/22 Order at 3.

[56] 1/31/22 Order at 3.

[57] 1/31/22 Order at 3.

We review the denial of a Rule 60(b) motion for abuse of discretion.[58] The trial court's analysis of Rule 60(b)(2) fell within its discretion and we will not disturb it. Rule 60(b)(2)'s text limits it to cases in which a party can "move for a new trial," i.e., those cases in which a trial has occurred. No trial occurred here, so Rayner could not seek relief under Rule 60(b)(2).

Likewise, the trial court did not abuse its discretion in denying Rayner's request to amend his complaint due to excusable neglect. In assessing whether a movant demonstrated excusable neglect, the question whether the appellant presented an "adequate defense" can be determinative.[59] When the appellant is a plaintiff, we examine this "'adequate defense[]' in the context of a claim for relief."[60] Thus, whether a "complaint failed to state a claim for which relief

---

[58] *See Moradi v. Protas, Kay, Spivok & Protas, Chartered*, 494 A.2d 1329, 1332 (D.C. 1985) ("The decision to grant or deny [a Rule 60(b)] motion lies within the sound discretion of the court.").

[59] *See Reshard v. Stevenson*, 270 A.3d 274, 283 (D.C. 2022) ("[W]e could perhaps sustain the trial court's determination that [appellant] has not shown 'mistake, inadvertence, surprise, or excusable neglect,' . . . notwithstanding the trial court's failure to consider all of the *Starling* factors, if [appellant] did not present an adequate defense." (quoting Super. Ct. Civ. R. 60(b)(1)).

[60] *Brown v. Kone, Inc.*, 841 A.2d 331, 334-35 (D.C. 2004).

be awarded" influences whether a plaintiff showed excusable neglect to merit amending that complaint.[61]

Here, the trial court concluded that Rayner's "newly discovered evidence" and his "proffered factual amendments" could not state a claim for which relief could be granted.[62]  In other words, granting Rayner leave to amend his complaint due to excusable neglect "would be futile."[63]  Because the court concluded that Rayner's proposed amended complaint could not state a claim for relief, Rayner did not provide an "adequate defense" and thus did not demonstrate excusable neglect.  The trial court, therefore, did not abuse its discretion in denying Rayner the opportunity to amend his complaint.

### III.  Conclusion

For the foregoing reasons, we sustain the three challenged rulings and affirm the judgment.

---

[61] *Id.* at 335.

[62] 1/31/22 Order at 3.

[63] 1/31/22 Order at 3.

*So ordered.*